MEMORANDUM OF DECISION
This memorandum of decision addresses petitions for termination of the parental rights (TPR) of Daniel S. and Cheryl A., pertaining to four of their minor children: Rebecca S., Katelyn S., and the twins Trevor S. and Tasha S.[2] Rebecca was born on September 1990; Katelyn was born on August 1992; and the twins were born on September 1994. The Department of Children and Families (DCF) filed the pending TPR petitions with the court on September 22, 1999. The petitioner has alleged the single ground of failure to rehabilitate as the basis for termination of each respondent's parental rights.
On December 3, 1997, DCF invoked a 96-hour administrative hold on all four children, and obtained an order of temporary custody (OTC) on December 5, 1997.[3] On December 4, 1998, Rebecca, Katelyn, Trevor and Tasha were adjudicated neglected children[4] and were committed to DCF by the Superior Court for Juvenile Matters. (Quinn, J.) On October 13, 1999, the commitments were extended until further order of the court. (Mack, J.) On May 2, 2000, the commitment was extended until December 11, 2000. (Brenneman, J.) On November 29, 2000 another one-year commitment was ordered by the court. (Mack, J.). CT Page 6724
The TPR trial was held on September 8 and 11 and December 22, 2000, and on January 29, 2001. The respondent father, who was present in court and was represented by counsel throughout, added his pro se appearance on December 11, 2000. The respondent mother elected not to attend the court sessions, but was represented by her attorney, who expressly waived her presence. See Practice Book § 33-4. The petitioner and the minor children were represented by counsel throughout the trial. Counsel for the minor children, also served as their GAL.
The Child Protection Session of the Superior Court, Juvenile Matters division, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the children at issue.
 I. FACTUAL FINDINGS
The parties introduced multiple exhibits at trial including written psychological evaluations, reports from mental health providers, a criminal history, social studies, and photographs. Testimony was elicited from numerous witnesses including psychologists, counseling service providers, DCF staff members, the foster mother and Daniel S.[5] The court has considered the verified petitions and all of the evidence, including the testimony presented, according to the standards required by law.[6] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial: A. DANIELS.
1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF DECEMBER 4, 1998
Daniel S. was born on August 22, 1951. Although he left school prior to completing eighth grade, he has completed his GED and earned some college credits. (Exhibits 4, 14.) He has a past history of three psychiatric hospitalizations, the last occurring in 1973. (Exhibit 14.) Daniel S. has been employed at the same boat yard on and off, for over thirty years, repairing, transporting and selling boats. (Exhibits 2, 4.) He also works part time stocking freezers in retail shops. (Testimony of Daniel S.) In the past, he maintained a bicycle shop, which was frequented by children. (Exhibit 11.)
Daniel S.'s long history of alcohol abuse commenced in early adulthood. (Exhibits 4, 11.) At one time, he had consumed "upwards of a case of beer and a fifth of liquor per day." (Exhibit C.) After receiving in-patient care for alcohol abuse when he was twenty-nine years of age, Daniel S. has found that he no longer needs the support of formal treatment or meetings to maintain his sobriety. (Exhibits 4, 15.) CT Page 6725
Daniel S. also has a long criminal history. Commencing in 1969, he acquired multiple convictions for driving under the influence of liquor, driving under suspension, reckless driving, larceny and disorderly behavior.[7] In 1970, he received two years of probation for breaking and entering, and possession of a firearm without a permit. In early 1973 and again in 1974, he was fined after conviction for disorderly conduct.[8] On October 2, 1976, Daniel S. received a ninety-day suspended sentence and a fine after conviction of assault and battery on a police officer. (Exhibit 5.) His most recent offense occurred on September 10, 1996, when he was arrested in Connecticut and charged with threatening, in violation of § 53a-62: he was convicted on June 11, 1997, and was sentenced to thirty days, suspended, with one year of conditional discharge.
In addition, Daniel S. has a significant criminal history specifically related to convictions for sex offenses against children, violation of release conditions release, and escape. On February 7, 1974, he was convicted in Massachusetts of indecent assault and battery upon a child under the age of fourteen, and was sentenced to serve one year, suspended, with one year of probation.[9] On May 21, 1974, he received probation after conviction of assault and battery on a police officer. Thereafter, on June 14, 1974, Daniel S. was found to have violated his release conditions, and was committed to serve the one year sentence of incarceration. (Exhibits 4, 5.) On December 16, 1974, he was arraigned on an escape charge and that the matter was disposed of through a fine. (Exhibit 5.) On May 14, 1976, Daniel S. was convicted in Massachusetts of two counts of indecent assault and battery on a child under the age of fourteen, and received a sentence of five-to-seven years to serve.[10]
In 1978, he was sentenced to serve three months for escape. On July 23, 1986, Daniel S. was convicted in Massachusetts of yet another sex offense involving a minor,[11] and was sentenced to serve two years for indecent assault and battery upon a child under the age of fourteen.[12]
(Exhibit 5.)
Daniel S. and Cheryl A. were married on June 28, 1981. Their first child, Kyle, was born in the early 1980's.[13] Kyle suffered from prematurity and severe developmental disabilities, which were originally treated at home, then at a skilled care facility until his death in 1994. (Exhibits 7, 8; Testimony of Marilyn K.) Their second child, Ryan S., was born on July 1985. (Exhibits 7, 8.) Rebecca was on September 1990; Katelyn was born on August 1992; and Trevor and Tasha, who were born on September 1994.
The family of Daniel S. and Cheryl A. came to the attention of DCF on July 14, 1995, when Cheryl A. requested assistance for Ryan, who had suffered from ADHD and behavior problems, and who was the victim of CT Page 6726 maternal physical abuse. At that time, the younger children's behavior was marked by physical aggression and emotional outbursts to which Cheryl A. seemed oblivious.[14] (Exhibits 12, 26; Testimony of Sean M.)
Daniel S. received individual counseling at The Fallon Clinic from January through June of 1996.[15] He also completed a parenting class and underwent a psychological assessment which yielded no indication that he was currently engaged in sexually abusive behavior. (Exhibit L.)
In the summer of 1996, Daniel S. was evaluated by Robert Meier, Ph.D., a psychologist who specializes in the forensic assessment of families and children. (Exhibits 2, 24; Testimony of Dr. Meier.) Dr. Meier noted Daniel S.'s borderline functioning with regard to his own hygiene, his work and living arrangements, and his continued associations with children under "highly questionable" circumstances. Dr. Meier "recommended that [Daniel S.] have no unsupervised contact with the children until he has undergone an intensive program of treatment for sexual offenders, and has demonstrated an ability to more effectively cope with his own emotional problems." (Exhibit 2.)
Also in 1996, the family court referred Daniel S. to NorthEast Clinical Associates (NorthEast Clinical) for sex offender evaluation and treatment in connection with an action which had been brought to dissolve his marriage to Cheryl A. After attending five therapeutic sessions with Scott S., Daniel S. determined that he was not satisfied with this process and that he did not have a good relationship with this therapist. Daniel S. did not follow through with additional sex offender services in response to the family court referral.[16] (Testimony of Daniel S., Sean M.; Exhibit 11.)
Daniel S.'s marriage to Cheryl A. was dissolved on September 11, 1997 (Booth, J.), and custody of the minor children was awarded to Cheryl A. (Exhibit 8.) On December 5, 1997 specific steps to facilitate the return of Rebecca, Katelyn, Trevor and Tasha to their father's custody were ordered at the Juvenile Court. (Potter, J.) These steps included participation in parenting and individual counseling; following the recommendations of DCF and service providers; accepting and cooperating with in-home support services referred by DCF; securing and maintaining adequate housing and legal income; and no further involvement with the criminal justice system. (Exhibit 18.)
On January 22, 1998, during a supervised visitation session with Rebecca, Katelyn, Trevor, Tasha and Ryan, Daniel S. was observed to be sitting on the ground when the children spontaneously "pig piled" upon him. Daniel S. did nothing to discontinue that behavior, or to redirect the children toward another activity. Daniel S. also played a game with CT Page 6727 Tasha and Trevor in which the respondent sat upon a chair, pulled his arm inside of his shirt, unfastened two buttons, placed a child between his legs, purposefully poked his finger out of the opened shirt in a position very close to his groin, wagged the finger and encouraged that child to grab onto the protruding appendage. (Exhibits 16, 21; see also Testimony of Sean M.) At the visit which occurred on January 29, 1998, Daniel S. played a teasing game with Tasha and then Katelyn which involved his asking "`who's the bad girl . . . is it you . . .?'"; grabbing the child and saying "`Daddy is going to get you'"; "mock spanking" by raising his hand high in the air, swinging it as if he was going to hit the child, but stopping the speed of his arm at the last second and tapping her on her rear end. (Exhibits 16, 21, 23.) Roughhousing with the children was also observed. (Exhibit 11.)
On February 5, 1998, DCF formulated a service agreement designed to diminish the amount of physical contact between Daniel S. and his children during visitation. This agreement identified its purpose as "safety planning during visitation with the children in light of [Daniel S.'s] two convictions of sexual molestation," and specified that he would refrain from mock spanking and have no contact with the children beyond a greeting and departing hug. (Exhibit H.) When Daniel S. signed the agreement and added "signed under cohersion (sic) of not seeing my children." (Exhibits H, 23.) DCF then suspended the visits. (Exhibits 22, 23, I.) On April 9 and June 4, 1998, Daniel S. underwent court-ordered evaluations by Robin Grant-Hall, Ph.D., a psychologist with experience in the forensic assessment and treatment of sex offenders. On July 10, 1998, Dr. Grant-Hall conducted an interactional observation of Daniel S. with the children, marking their first visit since early February. Dr. Grant-Hall found that Daniel S. "tends to externalize blame and sees other people as being responsible for his difficulties. . . . [H]e doesn't fully trust anyone. (Exhibit 11.) While Dr. Grant-Hall found that the children and Daniel S. had a meaningful relationship,[17]
warranting recommencement of visitation, she explicitly warned that "[m]oving beyond supervised visits is not possible . . . until [Daniel S.] is evaluated by a respected sex offender expert." (Exhibit 11.)
In late 1998, at DCF's referral, Daniel S. underwent a four-session sex offender evaluation with William Hobson, M.A., a certified and experienced provider of treatment for sex offenders. (Exhibit 24.) In his December 1, 1998 report, Mr. Hobson noted that Daniel S. both consistently avoided taking responsibility for his actions, and inappropriately rationalized that his sexual transgressions were acceptable in response to "invitations" from the child victims, or to the need to assist a school-aged boy by showering with him in order "to clean him up. . . ." (Exhibit 4.) Mr. Hobson concluded: "On [Daniel S.'s] part, it would be important for him to demonstrate through his CT Page 6728 participation in an offender treatment group that he is aware of potential risk situations, distorted thinking, and negative emotions which could contribute to a future reoffense and that he possesses the skills, knowledge, and self-control to be able to manage these potential dangers." (Emphasis added.) (Exhibit 24.) Mr. Hobson recommended that Daniel S. participate in specialized sex offender treatment, and provided information regarding therapists who were affiliated with acceptable credentialing agencies. (Exhibit 4.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF DECEMBER 4, 1998
On December 4, 1998, the court (Quinn, J.) ordered specific steps for Daniel S. to follow in an effort to regain the custody of the children.[18] (Exhibit 19.) These steps largely reiterated those which had been imposed on December 5, 1997 (Exhibit 18), but added the requirement that Daniel S. participate in sex offender counseling with Mr. Hobson, and comply with his recommendations.[19]
(Exhibit 19.) On January 5, 1999, Daniel S. completed a substance abuse evaluation at United Services: no treatment was recommended. (Exhibit 26.)
During the winter of 1999, Daniel S. attended four out of five family education seminars regarding sex offenses, sponsored by Mr. Hobson. No individual counseling was then provided, but the seminars enabled Marilyn K., a family friend who had attended all five sessions, to be designated an appropriate supervisor for Daniel S.'s visits with the children. (Exhibits D, E, F.)
In February 1999, Daniel S. commenced sex offender therapy[20] with William Conti, M.A., a licensed mental health counselor in Massachusetts who provides sex offenders treatment and evaluation. (Exhibits A, C, G.) He has continued in treatment since that time. (Exhibit G.)
3. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON SEPTEMBER 22, 1999
On January 6 and February 16, 2000, Daniel S. and the children evaluated by David Mantell, Ph.D., a skilled forensic psychologist with long experience in child protection matters.[21] In his report of March 14, 2000, Dr. Mantell disclosed that "[t]he father reveals a history of lifelong psychosocial and since early adulthood of psychosexual dysfunction that has severely impaired his adult functioning and his family relationships. It has, together with his alcoholism, interfered with his ability to develop and discharge a normal range childcare responsibility." (Exhibit 14.) He described the relationships between Daniel S. and the children as warm, affectionate, spontaneous, and characterized by "a lot of horseplay and activity, much physical contact CT Page 6729 with wrestling and running. . . . The play frequently became too rough and the children were borderline out-of-control. There was abundant physical contact in which the father was a full participant." (Exhibit 14.)
Daniel S. has attended all of the visits scheduled for him by DCF. (Exhibit I.) On June 29, 2000, DCF proposed a service agreement which specified behaviors that Daniel S. could not exhibit during subsequent visits, ostensibly in an effort to protect the children. The agreement would minimize, but not eliminate, the number of food treats and toys Daniel S. could bring to the visits; preclude him from promising to provide more gifts; restrict him from whispering to the children, asking where they chose to live, whether they wish to return to live with him, or discussing court proceedings with them; and prevent bringing "the puppy to any visit."[22] (Exhibit 27.) Daniel S. refused to enter into this agreement. (Exhibit 27; Testimony of Suzanne L.)
Recently, Daniel S. has been babysitting for a toddler. He asserts that the child's parents are fully aware of his history of sexual assaults. (Exhibit 14; Testimony of Sean M., Daniel S.) Daniel S. has brought this young child to some visitation sessions. (Testimony of Marilyn K.)
B. CHERYL A.
1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF DECEMBER 4, 1998
Cheryl A. was born on January 10, 1963. She was physically abused as a child, and was sexually molested by an uncle when she was ten years old. (Exhibits 2, 12; see also Exhibit 7.) She often ran away from home, and received foster care until she reached her majority. (Exhibits 2, 7.) Cheryl A. reports having earned an associates degree and being licensed as an EMT in Massachusetts (Exhibits 2, 7.) She has been employed doing clerical work and some machine work. (Exhibit 2.)
In the past, Cheryl A. has been hospitalized for her use of drugs, although no recent substance abuse is noted. (Exhibits 2, 7.) She has documented suicide attempts occurring at age fourteen and in the spring of 1996. (Exhibit 7.) Cheryl A. has received outpatient counseling at the Fallon Clinic, although she denied the need for such therapy. (Exhibits 2, 15; Testimony of Sean M.) She has received emergency mental health care at Day Kimball Hospital, and has been treated with anti-depressant and anti-psychotic medications. (Exhibit 12.) Cheryl A. also has a history of intense anger, verbal hostility and uncontrolled behavior that has required police intervention in recent times. (Exhibit 12.)
Cheryl A. met Daniel S. at an after-care program for substance CT Page 6730 abusers. They married in 1981 when she was eighteen and he was twenty-nine years old. (Exhibits 8, C.) As noted in Part I. A., above, the births of the children followed, and the marriage was dissolved in September of 1997. (Exhibit 8.) After Kyle died in 1994, Cheryl A. was hospitalized for treatment of depression. (Exhibit 7.) In July of 1995, Cheryl A. requested DCF's assistance in dealing with Ryan. However, she did not accept the proffered referrals to several in-home services.
Cheryl A. was hospitalized from March 30 through April 8, 1996, and treated for symptoms of extreme agitation with the use of Thorazine and physical restraints. During this admission, examinations revealed that she had such poor judgment, insight and impulse control that she lacked the ability to protect herself or her children. She was formally diagnosed with Adjustment Disorder of Conduct and Emotions, and Borderline Personality Disorder with consideration of a Major Depressive Disorder with Psychotic Traits,[23] and was advised to pursue after-care at Progressions, a mental health day treatment program. (Exhibit I.)
In the summer of 1996, Cheryl A. also underwent a court-ordered psychological evaluation, performed by Dr. Meier. He found her to be in a fragile psychological state with periods of confusion and signs of paranoid thinking. Dr. Meier noted that Cheryl A. had been overwhelmed with the responsibility of caring for her children, but was unable or unwilling to accept child care assistance when it was extended to her. Consistent with the results of Cheryl A.'s hospital evaluation, Dr. Meier concluded that Cheryl A. would not be able to adequately care for her children ". . . without a high degree of risk with regard to their safety and welfare."[24] (Exhibit 2.) Nonetheless, Cheryl A. was awarded custody of the children upon the dissolution of her marriage in September 1997.
On February 26 and March 12, 1998, Cheryl A. participated in an individual and interactional evaluations by Dr. Grant-Hall.[25] Dr. Grant-Hall again found that Cheryl A. lacked insight, and also noted that she projected anger onto institutional systems or people in lieu of accepting responsibility for problematic circumstances. Dr. Grant-Hall recommended that she attend a parenting class to learn basic parenting skills such as setting limits and consequences. (Exhibit 12.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF DECEMBER 4, 1998
Court-ordered specific steps, directed at reunification, were also issued for Cheryl A. on December 4, 1998. (Quinn, J.) (Exhibit 20.) The steps required her to participate in parenting, anger management and individual counseling; to sign releases allowing communication with counselors regarding her attendance and the progress of treatment; to CT Page 6731 refrain from substance abuse; and to assist her therapist in assessing her mental health and her ability to provide appropriate care for the children.[26] (Exhibits 20, 26.) At that time, Cheryl A. had started individual out-patient counseling at the Post Road Clinic, but this treatment was discontinued due to her lack of cooperation. (Exhibits 3, 7.) In the spring of 1999, Cheryl A. attended three two hour parenting sessions, and partially completed an anger management program sponsored by the Thompson Ecumenical Empowerment Group (T.E.E.G.). (Exhibits 16, AA.) At some point, Cheryl A. commenced individual therapy sessions, held every six weeks, with Dan D. at United Services.[27] (Exhibit 15.) Cheryl A. refused to sign authorizations which would allow access to her recent mental health or parenting program records. (Testimony of Sean M.)
3. EVENTS FOLLOWING THE FILING OF THE TPR PETITION ON SEPTEMBER 22, 1999
In the early part of 2000, Cheryl A. voluntarily began reducing her weekly visitations and minimizing her contacts with the children. (Exhibit 16; Testimony of Suzanne L.) Cheryl A. raised the subject of adoption with the children, and told them they would not see her until they were much older. In late May of 2000, Cheryl A. informed DCF that she would no longer participate in visitation and, at her request, visitation was discontinued.[28] (Exhibit 16.)
Cheryl A. did not attend or participate in the court-ordered psychological evaluations which Dr. Mantell was scheduled to perform in early 2000.
C. THE CHILDREN
The children have been emotionally attached to their father: they are generally very happy to see him, and behave well during their visits. (Exhibits 2, 11, 21; Testimony of Diane L.) In early February 1998, when Daniel S.'s visits were terminated by DCF, the children were extremely upset. (Exhibit 23; Testimony of Sean M.) They were delighted to see him during Dr. Grant-Hall's interactional evaluation in July 1998. During that visit, "All of the children initiated physical affection from their father either by climbing into his lap or rough housing with him (e.g. Rebecca jumped on his back). The children laughed a lot during the session and did not want it to end." (Exhibit 11.)
The children have also reacted positively when meeting their mother. In 1998, Dr. Grant-Hall reported "a strong bond between her and the children." (Exhibit 12.) The children were responsive to Cheryl A.'s wishes when she allowed visitation, despite her demonstration of "little spontaneous affection or attentiveness" toward them. (Exhibit 2.) From CT Page 6732 time to time, Cheryl A. also has displayed poor judgment in the presence of the children by making negative comments about DCF, addressing other "adult related issues", and inappropriately displaying anger, to their detriment. (Exhibit 12; Testimony of Sean M.)
When Cheryl A. verbalized her intention to sever her relationship with the children, Rebecca and Katelyn reacted with tears and sadness, although Tasha and Trevor had little response. (Exhibit 16; Testimony of Sean M.) Since their last visit with Cheryl A. in the spring of 2000, the children have not expressed any desire to see her again. (Exhibit 16.)
The children are well bonded to one another, and have lived comfortably together in the same foster home since December 30, 1997, when Rebecca and Katelyn joined Trevor and Tasha in their placement with Ethel and Richard K.[29] (Exhibits 7, 16, 26.) The children call their foster parents "Grammy and Poppy." (Exhibit 14.)
1. REBECCA
Rebecca was born on September 1990. She had developed quasi-parental characteristics while living in Cheryl A.'s home, and remained overly clingy during the early part of her stay with Ethel and Richard K. (Exhibits 7, 26.) Rebecca has no present memories of living with Daniel S., and knows him from their visitation sessions. (Exhibit 14.)
From January through March of 1998, Rebecca attended individual counseling at United Services. During this time, she attended to separation issues, and was successfully discharged from treatment. (Exhibit 15.) Ethel K. has worked extensively with Rebecca to enhance her ability to display healthy child-like attributes and maintain appropriate peer relationships, while minimizing her previous parentified behaviors. (Exhibit 16; Testimony of Ethel K.) Rebecca is an extremely intelligent child who performs well both inside and outside the classroom. (Exhibits 16, 26.) While this bright, energetic child has expressed her fervent desire to be adopted by her current foster parents, she also wishes to maintain contact with Daniel S. and Cheryl A. (Exhibits 17, 26.)
2. KATELYN
Katelyn was born on August 1992. She refers to her biological parents as "Cheryl" and "Danny." She also has no present memories of living with her father, but pleasantly recalls living with her mother. (Exhibit 14.) Katelyn has expressed her desire to be reunited with her mother, but also has adjusted well to her foster home and residence with her siblings. (Exhibits 7, 14, 26.) CT Page 6733
In the past, Katelyn was prone to outbursts of crying and whining. (Exhibit 26.) Although she displayed aggression, bed-wetting, and excessive masturbation when initially placed in foster care, these behaviors have largely dissipated. Katelyn appears to be less mature than her stated age, which makes it difficult for her to easily form peer friendships. Recent testing has placed her at and above grade level in academic ability, and she is making adequate progress in school. (Exhibit 16.) Ethel K. has actively pursued appropriate educational opportunities for Katelyn, and she maintains close contact with her school, so that this child's noted emotional and developmental needs are well addressed. (Exhibit 16; Testimony of Ethel K.)
Katelyn attended individual therapy at United Services to address her emotional issues related to the death of her brother Kyle. (Exhibits 7, 15.) She continues to receive weekly individual counseling. (Exhibit 16.)
3. TREVOR AND TASHA
Trevor and Tasha, born on September 1994, were three years old when placed in their current foster home.
Trevor identifies his foster parents as his mommy and daddy. While he expects to remain living with them, he has some distant memories of life with his biological mother. (Exhibit 14.) Trevor had displayed out of control behaviors and aggression when first placed in foster care: these behaviors have improved markedly, although there is a recently noted lack of academic gains which led to his repeating a grade in school. (Exhibit 16.) Trevor has recently been diagnosed with Attention Deficit and Hyperactivity Disorder, and he is scheduled for further evaluations of a possible learning disability and hearing loss. Ethel K. effectively works with the school to secure appropriate attention to Trevor's special educational needs. (Exhibit 16; Testimony of Ethel K.)
Tasha maintains strong attachments to both her biological and foster mothers. She has expressed a desire to continue living with Ethel K., in whose home Tasha is now well adjusted. (Exhibits 14, 26.) Early in her foster placement, Tasha had appeared very angry, prone to agitation and aggressive behavior, and was overly demanding of attention from adults. (Exhibit 26.) At her evaluation by Dr. Grant-Hall in early 1998, Tasha displayed "significant problems in verbalizing her feelings even to a limited degree and her frustration tolerance [was] extremely poor." (Exhibit 12.) Today, "Tasha's difficult behaviors have disappeared. She is a very bright and intelligent child who is performing above average in school and has appropriate peer relationships." (Exhibit 16.) CT Page 6734
 II. ADJUDICATION
During the adjudicatory phase of this hearing,[30] the court has considered the evidence and testimony related to circumstances and events following the finding of neglect on December 4, 1998 through September 22, 1999 when the TPR was filed, and events thereafter as relevant to the issue of failure to rehabilitate. The court has determined that statutory grounds for termination have been proved to exist, and that the petitioner has met her burden of proof on the issue of failure to rehabilitate as to both Daniel S. and Cheryl A.
A. LOCATION AND REUNIFICATION
With respect to the statutory elements of location and reunification,[31] the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the children with Daniel S. and Cheryl A. by facilitating the supervised visitation that was consistently utilized by Daniel S., and used by Cheryl A. until she voluntarily terminated visitation.
As to Daniel S., the court also finds, by clear and convincing evidence, that DCF made reasonable efforts to reunify the children with their father by providing the services set forth in Exhibit 16, and through Dr. Mantell's evaluation of Marilyn K., the respondent's friend and his chosen visitation supervisor. DCF also facilitated access a sex offender evaluation and treatment, necessary predicates to reunification under the circumstances of this case. (See discussion of sex offender services in Parts II. B. 1. and III. A. 1., below.) As discussed in Part II. B., below, despite these services, Daniel S. was unwilling or unable to gain control over his pedophilic traits, and he is therefore also unwilling or unable to benefit from reunification services. §17a-112 (c)(1).
As to Cheryl A., the court further finds, by clear and convincing evidence, that DCF made reasonable efforts to reunify the children with their mother through provision of the services set forth in Exhibit 16, and as further described in Parts II. B. 2. and III. A. 1. and 2., below, and by providing Dr. Grant-Hall's evaluation of Joe B., the respondent's boyfriend, a potential caretaker. However, through Cheryl A.'s decisions to withhold releases for disclosure of information concerning her current mental health status, to avoid Dr. Mantell's psychological evaluation, and to cease visitation with her children, she created self-imposed constraints on the reunification process which could not be overcome by reasonable reunification efforts.[32] In re ShaneP., 58 Conn. App. 234, 241, ___ A.2d ___ (2000). These constraints compel the conclusion that Cheryl A. was unable or unwilling to benefit from CT Page 6735 valid reunification services. § 17a-112 (c)(1). See In re Amelia W.,62 Conn. App. 500, 502-503, ___ A.2d ___ (2001).
B. STATUTORY GROUNDS FOR TERMINATION
In this case, the clear and convincing evidence establishes that neither Daniel S. nor Cheryl A. has accomplished personal rehabilitation within the meaning of General Statutes § 17a-112 (c)(3)(B).[33]
Although both parents have attended to some of the court ordered steps, neither has achieved such degree of rehabilitation as would encourage the belief that, within a reasonable time, he or she could assume a responsible position in the lives of the children. See In re Amy H.,56 Conn. App. 55, 60, 742 A.2d 372 (1999). Accordingly, the court finds the issues related to rehabilitation in favor of the petitioner.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. (Citations omitted; internal quotation marks omitted. .' In re Eden F., [250 Conn. 674, 706,741 A.2d 873 (1999)]. . . . `[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue.' (Internal quotation marks omitted.) In re Shyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165
(1999)." In re Sarah Ann K., 57 Conn. App. 441, 448, ___ A.2d ___ (2000). Thus, "[a]t the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the child's commitment." (Citation omitted; footnote omitted.) In re HectorL., 53 Conn. App. 359, 367, 730 A.2d 106 (1999).
Section 17a-112 (c)(3)(B)'s statutory framework thus requires the court not only to analyze a parent's rehabilitation in relation to the needs of the children involved, but also to consider if such rehabilitation is foreseeable within a reasonable time. In re Hector L., supra,53 Conn. App. 367. Because it must therefore discern what may happen within a reasonable time after the filing of the TPR petitions, the court has considered the conduct of Daniel S. and Cheryl A. following September CT Page 6736 22, 1999. In this case, a period of approximately one year and three months transpired between the filing of the TPR petitions and the close of evidence, during which time Cheryl A. made no measurable progress in crucial aspects of her personal rehabilitation process, and Daniel S. failed to achieve the benefit of services sufficient to render him able to assume a responsible position in the lives of the children within a reasonable time. See In re Ashley S., 61 Conn. App. 658, 666, ___ A.2d ___, cert. denied, 255 Conn. 950, ___ A.2d ___ (2001).
1. DANIEL S. — FAILURE TO REHABILITATE
The petitioner specifically claims that Daniel S. has failed to achieve § 17a-112 (c)(B)(3) rehabilitation from the conditions which cause him to be involved in sexual activities with children. Daniel S. counters that because he has participated in sex offender counseling, he no longer consumes alcohol, and he has not yet molested his own children, he is successfully rehabilitated. The clear and convincing evidence leads to a finding in favor of the petitioner.
In reaching this conclusion, the court has relied upon the credible and consistent evidence received from the mental health professionals who clearly and convincingly opine[34] that Daniel S. is affected with pedophilia, a persistent and permanent condition which adversely affects his capacity to serve as responsible parent for his children.[35] While pedophilia is a condition that cannot be cured, it may be controlled in some cases through long-term therapy and counseling. (Testimony of Dr. Mantell; Mr. Hobson.) The evidence in this case discloses, however, that even after a lengthy course of sex-offender therapy,[36] Daniel S. has failed to develop the behavior traits indicative of controlled pedophilia, in that he maintains an unrealistic perception of the serious nature of his own condition, lacks insight and remains impulsive. He has not demonstrated the requisite empathy for his victims, and fails to take responsibility for his past offenses, which he views as peccadillos. He erroneously attributes his past sex offenses to his use of alcohol, and argues that because he does not currently use alcohol, he is no longer at risk for sexual molestation of children. Alternatively, Daniel S. blames his sex offenses upon his young victims, claiming that they instigated such activity. The trial evidence received from professionals clearly and convincingly establishes that these attributes are all inconsistent with controlled pedophilia, and thus serve to belie the rehabilitation claims raised by Daniel S. (Testimony of Dr. Meier, Mr. Hobson, Dr. Grant-Hall, Dr. Mantell; Exhibit G.) See In re John G., supra, 56 Conn. App. 24.
The copious evidence and expert testimony related to Daniel S.'s pedophilic activities illustrate the entrenched nature of his condition. In 1996, Dr. Meier had noted Daniel S.'s lack of insight concerning his CT Page 6737 past sex offenses, and accordingly warned: "[Daniel S.] minimizes the previous history of sexually molesting several children. . . . Those whohave engaged in such behaviors are not easily rehabilitated . . . He shows little remorse for his actions, justifying his actions as being due to his alcohol abuse, and minimizing the seriousness of the actions by suggesting there was no violence used. In addition, his judgment is highly questionable. After serving time for three convictions for child sexual molestation, he continued to put himself in vulnerable positions by sleeping with his children, and not his wife. . . ." (Emphasis added.) (Exhibit 2; see also Exhibit C.)
Daniel S.'s lack of insight, and problems with judgment and remorse, were again manifest during his examination by Dr. Grant-Hall. In July of 1998, she found that Daniel S. had a predisposition toward anti-social behaviors such as "risk taking and a tendency toward being impulsive." (Exhibit 11.) This psychologist inauspiciously noted, as had Dr. Meier, Daniel S.'s "striking . . . lack of accountability, embarrassment, and/or remorse while recounting his sex offense history."[37] She found that Daniel S. possessed "no insight into his past sexual offenses and wants
to believe that his deviant sexual behavior was simply alcohol induced." (Exhibit 11.) Dr. Grant-Hall rebutted this position by explaining that it was inaccurate to attribute sexual molestation of children to the consumption of alcohol, rather than to the individual's decision to offend.[38] (Exhibit 11; see also Testimony of Mr. Hobson.)
In his fall 1998 evaluations, Mr. Hobson yet again discerned the recurrent themes of Daniel S.'s lack of insight into the chronic nature of his pedophilia, intrinsic poor judgment, and failure to take responsibility for his actions. (Exhibits D, 19.) Although he had voluntarily subjected himself to periods of incarceration in Massachusetts, Daniel S. denied that he had committed certain offenses, and again implicated alcohol as his impetus for molesting children. (Exhibits 4, 24.) He protested that independently, without sex offender treatment, he had "changed himself from the individual who admittedly abused substances, committed various criminal behaviors, and sexually abused minor males." (Exhibit 24.) Mr. Hobson's cogent professional assessment contradicted Daniel S.'s self-perceptions, and again identified multiple and chronic pedophilic characteristics: Daniel S.'s absolute lack of remorse and lack of empathy for the children he molested; his insistent "belief that there were no lasting effects from his abuse of his victims . . ."; his lack of insight into his motivation for offending; and his proposition that his unlawful behavior was merely due to his "lack of social and sexual experience with females at the time." (Exhibit 4.)
When Daniel S. commenced his sex offender counseling with Mr. Conti in CT Page 6738 early 1999, following the findings of neglect, he identified his personal goals of regaining custody or increasing visitation with his children, and he acknowledged that sex offender treatment was required to achieve these results. (Exhibits B, G.) In contrast, Mr. Conti set therapeutic, rather than legal, goals for Daniel S.: "Overcome any denial/minimization concerning offending hx and potential future risks — Understand impact/develop empathy regarding victim. Explore precipitants/motivations for offending. Develop relapse prevention plan." (Exhibit G.)[39] Mr. Conti's designated goals were particularly apt for Daniel S. who, despite his multiple criminal convictions and repeated long-term incarcerations, had yet to express remorse, took little responsibility for his actions, saw little reason why anyone should now be concerned about these past offenses, and did not consider himself to be a risk to his children.[40]
(Exhibit 2.)
Unfortunately, despite continuing sex offender therapy with Mr. Conti, Daniel still displays the lamentable lack of insight, poor judgment and failure to assume responsibility which were earlier noted by Dr. Meier, Mr. Hobson and Dr. Grant-Hall.[41] Mr. Conti even questions the degree of progress that has actually been achieved, despite Daniel S.'s cooperation and plans to continue treatment. In August of 2000, after approximately a year and a half of counseling, this thereapist acknowledged Daniel S.'s extant problems with insight into his pedophilia, writing as follows: "I am concerned that he continues to minimize the meaning of his prior behaviors. He maintains his 1970's behaviors were not indicative of pedophilia; he attributes it to alcohol use, low esteem, and loneliness. [Daniel S.], despite his arrest, denies any offending behavior in the 1980's. He disagrees when I suggest that decisions to have one boy sleep over his house, and to shower with another, were examples of extremely poor decision making even if, as he maintains, he did not molest them." (Exhibit G.)
Mr. Conti's opinions clearly and convincingly establish, as well, the insidious nature of Daniel S.'s unabated pedophilia. (Exhibit G.) For instance, although Daniel S. professes to have no current fantasies, urges or current behaviors relating to sexual activity with children, Mr. Conti proposes that "pedophilia is unconscious to him." (Exhibit G.) With regard to Daniel S.'s potential for sexually victimizing children in the future, Mr. Conti, who has long known and worked with this patient, candidly concluded: "I feel in the right situation there could be significant risk." (Exhibit G.) Even more troubling, given the issues before the court, is Mr. Conti's stated opinion on the issue of whether Daniel S. is at risk for sexually offending his own children. Mr. Conti has responded: "I think [Daniel S.] is probably sincere when he states he would not molest his children, i.e., there may be no present pre-meditation to do so. However, I remain concerned that his limitedCT Page 6739insight into his behaviors in the 1970's and 1980's does place him atrisk. I cannot base this opinion on recent behavior, i.e., I have not seen evidence to indicate he is currently engaging in sexual risk behavior. Nevertheless, it is difficult for me — and, I suspect, any other professional who has been involved in this case — to get beyond his history." (Emphasis added.) (Exhibit G.) Although Daniel S. asserts his sobriety, Mr. Conti has identified potential alcohol use,[42]
stress,[43] and single parenthood[44] as factors that would increase the respondent's risk of return to sex offending behaviors. (Exhibits G, C.)
Dr. Mantell's evaluations in early 2000 ratified Mr. Conti's concerns that Daniel S. maintains a chronically poor level of judgment concerning physical contact with children, and that his pedophilic characteristics have not been resolved despite many months of treatment.[45] Dr. Mantell credibly explained that Daniel S.'s misperceptions about his condition result from his intrinsic "cognitive distortion," which is classically present in persons who abuse children.[46] This condition impels Daniel S.'s deluded assumption that he has achieved control over his impulses, and is therefore no longer at risk for sexual misconduct with children. As a practical matter, cognitive distortion also renders Daniel S. unable to understand the impropriety of his service as an unsupervised babysitter for a young child, or the need to curb his involvement in the behaviors which were the subject of the July 2000 service agreement.[47] (Exhibit 27). Consistent with Mr. Conti's concern about future offenses, Dr. Mantell persuasively cautioned that Daniel S.'s cognitive distortion is of such a degree that, despite his treatment, the recurrence of pedophilic behaviors must reasonably be anticipated, and that this respondent therefore should be precluded from consideration as a valid custodial parent.[48] (Testimony of Dr. Mantell; Exhibit G.)
Although Daniel S. claims to have "changed" and that he is no longer prone to pedophilic behavior, the court credits and accepts Dr. Mantell's conclusion that no such change has occurred, and that Daniel S.'s fundamental inability to view life through a realistic lens leads him, mistakenly, to claim successful rehabilitation.[49] (Exhibit 11; Testimony of Dr. Mantell, Dr. Meier.) In Dr. Mantell's opinion, Daniel S. "continues to evidence high-risk behaviors placing himself and others at-risk. Though repeatedly admonished to avoid unsupervised contact with minor children, he continues to pursue this and in ways that suggest that he is grooming these children as pedophiles do[50] though he admits to no conscious awareness of such and no actual sexual acts. . . . He still displays cognitive distortions suggesting that he was somehow victimized by the aberrant sexual interests of his adolescent victims whose cooperation he plied with food, drink, and favors." (Exhibit 14; see also CT Page 6740 Testimony of Dr. Mantell.) Both Dr. Mantell and Mr. Conti have thus raised the concern that Daniel S. may not be conscious of his pedophilic tendencies, so that the respondent may not even know when he becomes involved in the process of building relationships with children as a means of preparing for their sexual victimization. (Exhibits G, 14; Testimony of Dr. Mantell.) That both the experts question whether Daniel S. is even conscious of his sex offender traits and habits, after many months of treatment, compels the conclusion that because Daniel S. is unwilling or unable to comprehend that he is participating in pedophilic acts, he cannot be expected to take appropriate, affirmative steps to prevent himself from causing harm to children.
As noted in Part I. A. 1., above, Daniel S.'s sex offenses against children have involved "play" activities which were clearly improper, but that he felt were acceptable.[51] The evidence further reveals that Daniel S. engaged in games and grooming-like activities with his own children,[52] even following his course of sex offender therapy with Scott S. at NorthEast Clinical in 1996. (See Exhibits 21, 23.) Although such behavior may well be harmless when exhibited by whose who are not pedophiles, Daniel S.'s conduct in allowing the children to lie upon him in a "pig pile" fashion, inviting them to grab hold of a "wagging" finger which protruded through opened clothing, teasing a child by calling her a "bad girl," or even "mock spanking" and wrestling all ominously resemble intimate foreplay. (Exhibits 14, 16, I.) In Daniel S.'s situation, these activities must reasonably be identified as grooming behaviors, prodromes for sexual abuse, notwithstanding their occurrence in the context of supervised visitation. (Testimony of Dr. Mantell.) This aspect of Daniel S.'s behavior, taken together with Dr. Mantell's and Mr. Conti's concern that the respondent's pedophilic traits are remain uncontrolled so that he remains at risk for recurrent offenses, strongly supports the inference that if left unsupervised, Daniel S.'s play activities with children would likely even more closely approximate sexually-charged behavior.
Other evidence further supports the conclusion, reached by the experts and joined by this court, that Daniel S.'s pedophilic traits are refractory even to long-term sex-offender treatment, and that he is fundamentally unable or unwilling to appreciate the extent of his conscious or unconscious proclivity toward grooming behaviors. (Testimony of Dr. Mantell; Exhibit G.) Daniel S.'s continued voluntary service as an unsupervised babysitter, in the face of his prior sex offenses and counseling by Mr. Conti, demonstrates persistent denial that his pedophilic traits require external controls, and supports the inference that he is still willing to take undue risks affecting the safety of children. (Testimony of Dr. Mantell; Exhibit G.) The evidence concerning Daniel S.'s refusal to sign the July 2000 service agreement similarly CT Page 6741 reflects his failure to acquire appropriate insight and control over his pedophilic tendencies. (Exhibit 27) This service agreement was obviously directed at limiting Daniel S.'s involvement in subtle grooming conduct such as enticing the children with gifts, "secret" information, or a puppy, as discussed above. (Exhibit 27; Testimony of Suzanne L.) However, notwithstanding his sex offender treatment, Daniel S. could not or would not appreciate the protection that would be provided to his children as the result of conforming his behavior as requested.[53] (Testimony of Dr. Mantell; Exhibit G.)
It is overwhelmingly apparent that despite his ostensible current compliance with the court-ordered sex-offender treatment, Daniel S. has failed to overcome his denial and minimization concerning his history of offenses, his lack of remorse and empathy for his victims, and his limited acceptance of responsibility for his sexual misconduct with children. The experts consistently found that he has not gained the necessary insight into his past sexual abuse of children. He has neither developed a clear plan for prevention of relapse, nor has he overcome his denial and minimization about his pedophilia, despite Mr. Conti's goals. Thus, he has not emerged from treatment with reliable and demonstrated control over his capacity for offending. (See Exhibit G.) It is significant that no mental health professional, including Mr. Conti, has been able to forecast a particular date on which Daniel S. will likely be rehabilitated and able to serve as a safe parent for his children: at best, as Mr. Hobson indicated, Daniel S. would require many additional months of sex offender treatment, before he could complete the three to five year regimen of active sex offender treatment that is a prerequisite to restoration of safe parenting abilities. (Testimony of Mr. Hobson.) This is far too long for Daniel S.'s children, however patient, to be expected to wait. In re Hector L., supra. 53 Conn. App. 367.
In view of the intractable nature of Daniel S.'s pedophilia and cognitive disorder, it is clear that his rehabilitation cannot be forseeable within a reasonable time, considering the age and needs of the children at issue here. In re Eden F., supra, 250 Conn. 706. He has already been provided with one short and one extended course of sex offender treatment, yet has failed to demonstrate that he has progressed in his ability to develop the insight and skills necessary to provide a safe home, or secure and appropriate parenting for Rebecca, Katelyn, Trevor or Tasha. In reaching this determination, the court has paid heed to Mr. Conti's concern that Daniel S.'s risk for relapse would likely increase if he served as his children's primary caretaker. The stresses of single parenthood, identified by Mr. Conti, are likely to escalate as these children emerge from childhood into adolescence. (Exhibit G.) The special needs of Trevor and Katelyn, as discussed in Part I. C. 2. and 3., above, especially mandate their caretaking by parent figures who are CT Page 6742 reliable, trustworthy, and sufficiently mature to address their sensitive emotional conditions. They are entitled to a childhood supervised by an adult, such as Ethel K., whose behavior is predictable in its ability to nurture and enhance their healthy development, without opportunistic influences from any person seeking to engage them, even unconsciously in sexual activities.[54] See In re Sarah Ann K., supra, 57 Conn. App. 448;In re Shyliesh H., supra, 56 Conn. App. 180; In re Hector L., supra,53 Conn. App. 367.
In assessing Daniel S.'s degree of rehabilitation, the court has paid heed to the positive aspects of this case, which include his relative cooperation with the sex offender treatment process, and the demonstration of some effective parenting skills, as described in Part I. A. 1. above. Daniel S. is bonded to his children, and visits them regularly. Nonetheless, the court is obliged to note these positive factors with a chary eye in view of the predominate, negative aspects of Daniel S.'s persistent pedophilia.
For example, it is clear that Daniel S. "genuinely loves his children" and that they have sincere affection for him, as well. (See Exhibit G.) Neither this emotion, nor his valid parenting skills, noted by Dr. Grant-Hall, can overcome the facts that Daniel S. has not learned to control his pedophilia, remains impulsive, and is subject to relapse especially under stressful conditions such as single parenthood. (Exhibits G., 14; see Part II. A.) "[A] parent's love and biological connection . . . is simply not enough" when the circumstances indicate, as here, that a respondent cannot serve as a competent parent because he has not become rehabilitated, and thus cannot provide his children with the nurturing and safe environment they so richly deserve. In re AshleyS., supra, 61 Conn. App. 667.
Daniel S. would also have the court focus upon evidence that he has never molested his own children and has never voiced the conscious intention to do so. It is true that Daniel S.'s last sex offense conviction was recorded over fourteen years ago. However, the court cannot ignore his pattern and history of molesting young children who knew him well. Daniel S.'s continued participation in grooming behaviors and his work as a solo babysitter, considered along with his own therapist's opinion that he lacks insight into his condition, reinforces the conclusion that he still makes inappropriate judgments when relating to children, and thus is at risk for recurrent offenses. The consistency of the conclusions drawn by Dr. Meier in 1996, by Dr. Grant-Hall and Mr. Hobson in 1998, and by Dr. Mantell and Mr. Conti in 2000 compels the court's determination that, under the totality of the circumstances here existing, Daniel S. remains an unsafe factor insofar as children are concerned. CT Page 6743
Connecticut law directs that where the subject of parental rehabilitation from pedophilia is concerned, the court must focus not on the issue of mere attendance at services, but whether, as the result of participation in these services or due to other factors, the parent is or will become able to assume a responsible position in the lives of the children within a reasonable amount of time. In re Ashley S., supra,61 Conn. App. 666. At trial, Daniel S. explained that he has learned about risk factors for sex offenders, and about relapse prevention, which includes keeping away from alcohol, playgrounds, parks, swimming pools, and other places where children congregate. (Testimony of Daniel S.) Unfortunately, despite the treatment, he persists in specifically correlating his sex offenses to his past consumption of alcohol, remains unable to relate his sex offender instruction in a way that would enable him to control himself under circumstances that would bring him into close contact with children, including his own. (Testimony of Daniel S., Dr. Meier, Dr. Grant-Hall, Mr. Hobson; Exhibit G.)
Assessed in the light of his serial evaluations and his history of criminal convictions, the evidence in this case thus clearly and convincingly confirms that Daniel S. was far from completing the process of rehabilitation by the time of trial, and that his condition was and remains intractable. (See Exhibit G.) As the testimony of Dr. Grant-Hall made abundantly clear: first, without satisfactorily progressing through sex offender treatment, Daniel S. cannot be expected to serve as a safe caretaker for his children; and second, if Daniel S. persists in demonstrating a lack of insight or remorse despite treatment, the children still would not be safe in his custody. (Testimony of Dr. Grant-Hall; see also Testimony of Dr. Meier.)
The circumstances presented by this case fall into the second category forseen by Dr. Grant-Hall. It may be true that Daniel S.'s attendance at sex offender therapy sessions demonstrates that he is now somewhat better able to manage his own life than he was at the time the neglect petitions were filed. See In re Sarah Ann K., supra, 57 Conn. App. 448. However, his lack of overall rehabilitation dictates the conclusion that Daniel S. has not gained the ability to care for the particular needs of the children at issue, which include their communal need to be safe and secure in their physical and emotional selves, and to live without exposure to the conscious or unconscious acts of a pedophile and the significant harm that can result. In view of Daniel S.'s cognitive distortion and persistent lack of insight, it cannot reasonably be inferred that he can, within a reasonable period of time, achieve the ability to understand the special educational and emotional needs present in Katelyn and Trevor, or become able to effectively advocate on their behalf. See In re Sarah Ann K., supra, 57 Conn. App. 448. These CT Page 6744 deficiencies, viewed in the context of the respondent's history of convictions and pattern of continuing prodromal conduct with young children, further supports the conclusion that the petitioner has clearly and convincingly met her burden of proving that Daniel S. has failed to achieve rehabilitation as contemplated by § 17a-112 (c)(3)(B). See Inre Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000); In re AshleyS., supra, 61 Conn. App. 666-667.
2. CHERYL A. — FAILURE TO REHABILITATE
The petitioner claims that Cheryl A. has failed to achieve rehabilitation, within the meaning of § 17a-112 (c)(3), from her continuing, unresolved mental health conditions. Cheryl A. counters that she has participated in personal counseling, and that she has learned the skills necessary for successful parenting her children. For the following reasons, the court finds this issue in favor of the petitioner.
The evidence related to Cheryl A.'s failure to rehabilitate largely focused upon her significant mental health issues, which remain unresolved. In assessing whether mental health evaluations and treatments have rendered a respondent parent rehabilitated, the issue, again, is not mere attendance at counseling sessions but, instead, whether the parent has become able to assume a responsible position in the lives of the children within a reasonable time. Applying the test of In re Ashley S., supra; 61 Conn. App. 666; to Cheryl A.'s case, while it is apparent that the respondent mother has attended some counseling sessions and has completed some parenting programs, the evidence clearly and convincingly establishes that she remains without the qualities necessary to successfully parent her children, especially Katelyn and Trevor who present with special emotional and educational needs.
Cheryl A.'s failure to achieve adequate control for her long-standing mental health problems was established through the documentary records related to her mental health history, and through the credible psychological opinions tendered by Dr. Meier and Dr. Grant-Hall. As described in Part I. B., above, the documentary evidence reflects Cheryl A.'s past hospitalization for substance abuse, suicide attempts, depression, and her underlying diagnosis of Adjustment Disorder of Conduct and Emotions and Borderline Personality Disorder, with consideration of a Major Depressive Disorder with psychotic traits. (Exhibits 1, 2, 7, 12, 15, C; Testimony of Sean M.) Dr. Meier's conclusions in 1996 are described in Part I. B., as well.
Dr. Grant-Hall's 1998 evaluation of Cheryl A., which occurred prior to the submission of the TPR petitions, revealed that despite past treatment and medication therapy, Cheryl A.'s thought process remained psychotic in CT Page 6745 nature. Cheryl A. was further found at that time to lack appropriate remorse related to her behavior, and her over-all ability to make judgments, including those relating to the children, was severely impaired.[55] Cheryl A.'s anger was self-destructive: her difficulty processing reality had a major adverse affect upon her parenting conduct. (Exhibit 12; Testimony of Dr. Grant-Hall.) At the time of this examination, Cheryl A. did "not understand appropriate developmental expectations [for the children] and she demonstrated little insight into each of her children's individual areas of weakness and needs." (Exhibit 12.) Dr. Grant-Hall further explained that Cheryl A.'s passive parenting style rendered unable to provide the emotional support and limit-setting her children required. At that time, Dr. Grant-Hall presaged that although therapy with a qualified mental health care provider was recommended, "[Cheryl A.'s] personality problems are so severe that reunification with her children is not likely to occur in the near future." (Exhibit 12.)
The evidence clearly and convincingly revealed that Cheryl A. did not adequately attend to her need for parenting, anger management and individual counseling. While she partially completed the T.E.E.G. programs referenced in Part I. B. 2., above, attended some parenting classes and anger management courses, the court lacks evidence that she sufficiently benefited thereby. Cheryl A. was unwilling to invest even a de minimus amount of emotional or financial effort toward her personal counseling at the Post Road Clinic, failed to attend or submit to the court-ordered psychological evaluation by Dr. Mantell, failed to appropriately execute releases allowing DCF to follow her progress with mental health counseling, and she has not participated in a substance abuse evaluation. (Exhibits 3, 14, 26.) Cheryl A. has effectively refused to provide access to any information concerning her treatment with Dan D. at United Services, leaving the court without any evidence through which to infer that she has gained insight or control concerning her documented mental health issues.
There can be no obligation, on DCF's part, to force Cheryl A. to visit with her children.[56] Cheryl A.'s independent determination, in the spring of 2000, that she would no longer even visit with her children, demonstrated her clear intention to avoid cooperation with DCF and further efforts at rehabilitation, all to the detriment of the reunification process. In view of her decision to truncate her contacts with Rebecca, Katelyn, Trevor and Tasha, it is disingenuous to expect the court to infer that Cheryl A. was committed, or even interested in, maintaining a viable relationship with them, after the spring of 2000. Inre Sarah Ann K., supra, 57 Conn. App. 448.
Cheryl A.'s history of poor judgment in choosing topics to discuss with CT Page 6746 her children, and her demonstrated inability to display spontaneous maternal affection are consistent with Dr. Grant-Hall's conclusion that this respondent suffers from serious mental health issues, which would require a substantial degree of treatment before appropriate parenting skills could be developed. Without evidence of such intervention, Cheryl A. remains no better able now to resume the responsibilities of parenting than she was at the time of the filing of the termination petition, or at the time of the children's commitment. In re Hector L., supra,53 Conn. App. 367. Furthermore, there is no basis for finding that within a reasonable time, considering the age and needs of all the children at issue, especially given the special educational and psychological needs of Katelyn and Trevor as described in Part I. C., Cheryl A. could, or would be willing to, soon assume a responsible position in their lives.In re Sarah Ann K., supra, 57 Conn. App. 448; In re Shyliesh H., supra,56 Conn. App. 180; In re Hector L., supra, 53 Conn. App. 367. Under these circumstances, the court finds that the petitioner has met her burden of proving, by clear and convincing evidence, the elements of Cheryl A.'s failure to rehabilitate, within the meaning of § 17a-112 (c)(3)(B).
 III. DISPOSITION
As to the dispositional phase of this hearing,[57] the court has considered the evidence and testimony related to circumstances and events up to and including January 29, 2001, the date upon which the evidence in this matter was concluded.
A. SEVEN STATUTORY FINDINGS — § 17a-112 (d)
In determining whether to terminate parental rights in this case, the court has considered the evidence and information relevant to each of the following seven findings:[58]
 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (d)(1)
The court finds by clear and convincing evidence that appropriate and timely reunification services were provided by DCF, including, as to both parents, casework services with home visits, supervised visits, transportation through DCF for Cheryl A.'s visitation, and the coordination of services needed by the family. See Part II. A., above. (Exhibits 7, 15, 16.)
As to Daniel S., noting his prior work with Scott S. at NorthEast Clinical, DCF re-referred him to that agency and to Connecticut Valley Counseling for a sex offender evaluation by Mr. Hobson; and for sex offender treatment with Mr. Conti.[59] (Exhibits 15, 16, 24.) He was referred to United Services for a substance abuse evaluation, and has CT Page 6747 also been referred by DCF for anger management classes and individual therapy. (Exhibits 15, 26.) Daniel S. was also referred to the Fallon Clinic where he received a substance abuse evaluation and counseling, and he had been provided with sex offender counseling at North East Clinical Associates. (Exhibits 15, 16.)
As to Cheryl A., DCF provided her with information concerning available parenting classes, with instructions on how to contact relevant providers. (Exhibit 13.) DCF made specific contact with her therapist at the Post Road clinic to facilitate compliance of Cheryl A.'s individual counseling as per the court-ordered steps. Cheryl A. has, however, demonstrated a notable lack of interest in or hostility to engagement in the psychotherapeutic services necessary to reunify her with Rebecca, Katelyn, Trevor and Tasha, which attitude is likely consistent with her failure to execute releases permitting disclosure of information relating to her mental health status, and her failure to personally attend the trial of this matter.[60] (Exhibit 3.)
2. REASONABLE EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112 (d)(2)
The court finds by clear and convincing evidence that DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, given the situation and circumstances here existing, and recognizing both respondents' persisting problems in achieving rehabilitation. See Part II. A., above. The action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and to secure permanent placement for children, such as Rebecca, Katelyn, Trevor and Tasha, who are in foster care.
DCF has contemplated placement of the children with Cheryl A.'s sister, who contacted the agency with her husband to provide a potential adoptive resource. However, the children have not expressed positive feelings toward this maternal aunt and her husband: Rebecca has negative feelings, and Tasha and Trevor have no memory of these relatives. (Exhibit 15.)
3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
Reasonable and realistic steps for rehabilitation and reunification were established as orders for Daniel S. on December 5, 1997, and for both Daniel S. and Cheryl A. on December 4, 1998.
The court finds by clear and convincing evidence that Daniel S. has complied with orders relating to his visitation with the children who are CT Page 6748 the subject of this petition. (Exhibits 3, 7.) DCF has admitted that Daniel S. has displayed no inappropriate behavior during many of these visits. (Exhibit 3.) Daniel S. is gainfully employed, has not been further involved with the criminal justice system, has executed releases when requested, and successfully completed a substance abuse evaluation. Daniel S. participated in a sex offender evaluation by Dr. Hobson and as of February 1999, he has consistently attended offender counseling sessions. (Exhibits 26, G.)
The court further finds by clear and convincing evidence that at times Cheryl A. has been uncooperative with DCF, refusing even to speak with divers social workers who have attempted to elicit information concerning the family's history, or to sign releases for the procurement of information relating to her mental health counseling, despite court orders. (Exhibits 7, 13; Testimony of Sean M.) At times, she has refused to allow DCF to visit her home without unreasonable conditions, and also refused to meet with DCF workers at their office.[61] (Exhibit 13.) She has refused to follow through with individual therapy or anger management groups on occasion. (Exhibit 3.) She has failed to attend or submit to a psychological evaluation by Dr. Mantell, and has not participated in a substance abuse evaluation. (Exhibits 14, 26.)
For a significant period of time prior to May, 2000, Cheryl A. consistently attended scheduled supervised visits with the children. (Exhibits 3, 7.) She has also complied with some of the court-ordered expectations. She participated in relatively brief parenting and anger management classes at T.E.E.G., albeit without achieving demonstrable benefit. (Exhibits 3, A.) She occasionally attended individual therapy sessions to work on issues related to visitation with her children. (Exhibits 15, 26.)
4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — § 17a-112 (d)(4)
The court finds by clear and convincing evidence that a bond has existed between these children and Cheryl A., such that she remained their psychological parent at the time of Dr. Grant-Hall's interactional evaluation in early 1998. (Testimony of Dr. Grant-Hall). During subsequent years, however, even prior to Cheryl A.'s voluntary cessation of visitation, their primary emotional relationship flourished with their foster mother. (Testimony of Dr. Mantell.) The children genuinely appreciate contact with Daniel S., who serves as an enjoyable playmate or visitor, and who evokes strong positive reactions from them. However, they neither manifest primary emotional ties with him, nor express a desire to live with him. (Testimony of Dr. Mantell.)
The children interact well with their older brother, Ryan. (Testimony CT Page 6749 of Sean M.) However, there was insufficient evidence from which the court could reasonably conclude that maintenance of a residential relationship with Ryan is fundamental to the preservation of their best interests.
5. AGES OF THE CHILDREN — § 17a-112 (d)(5)
Rebecca is ten and a half. Katelyn is eight and a half. Trevor and Tasha are six and a half years old. These children have been in foster care for over three years.
 6. EFFORTS MADE BY THE PARENTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112 (d)(5)
The evidence in this case clearly and convincingly indicates that Daniel S. has attended the sex offender evaluations referenced above, and has participated in counseling with Mr. Conti. However, he has neither sufficiently changed his behavior nor developed requisite insight into his past sex offenses as a result of receiving these services, and therefore it is not in the best interest of the children to return them to his home.[62] The court further finds that while Cheryl A. did visit with the children through May of 2000, she then stopped visitation, and has not made a sufficient effort to adjust her circumstances to make it in the best interests of the children to return them to her home.
 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112 (d)(6)
The court finds, by clear and convincing evidence, that DCF's temporary suspension of Daniel S.'s visitation with his children during the spring of 1998 was prompted by that agency's reasonable response to his ostensible unwillingness to comply with legitimate requests for modified conduct. Visits were reinstituted within a few months, following the interactional evaluation by Dr. Grant-Hall. As such, no unreasonable interference with Daniel S.'s ability to maintain a relationship with his children can be identified by the court.
As to Cheryl A., the clear and convincing evidence establishes that while her children appreciated attention from her, she ultimately chose to absent herself from them, and that she willfully avoided visitation sessions after May 2000. When Cheryl A. requested unsupervised visitation with her children, DCF reasonably requested that she provide a letter from her therapist stating that she would not thereby present any danger to them: Cheryl A. failed, however, to produce such a document.[63]
(Testimony of Diane L.) Any interference with the process of maintaining a relationship with Rebecca, Katelyn, Trevor or Tasha was therefore caused by Cheryl A., and not by the petitioner or third parties. See InCT Page 6750re Amelia W., 62 Conn. App. 500, 506, 500, ___ A.2d ___ (2001).
B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (c)(2)
The court is next called upon to determine whether termination of the parental rights of Daniel S. and Cheryl A. would be in the best interests of Rebecca, Katelyn, Trevor and Tasha.[64] "In making this determination, the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition." (Citation omitted.) In reKasheema L., 56 Conn. App. 484, 488, 744 A.2d 441 (2000).
In determining whether termination of the parental rights of Daniel S. and Cheryl A. would be in the best interests of Rebecca, Katelyn, Trevor and Tasha, the court has examined multiple relevant factors including, among other things, the length of the children's stay with their foster parents; the nature of their relationship with their foster parents; the nature of their relationship with their biological parents; the degree of contact maintained with them; and their genetic bond.[65] In re SavannaM., 55 Conn. App. 807, 816, 740 A.2d 484 (1999). Throughout, the court has paid heed to the premise that "`[t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment.' (Citations omitted; internal quotation marks omitted.) Schult v. Schult,241 Conn. 767, 777, 699 A.2d 134 (1997)." In re Shyina B.,58 Conn. App. 159, 167, ___ A.2d ___ (2000); see also In re AlexanderC., 60 Conn. App. 555, 559, ___ A.2d ___ (2000).
Over time, Dr. Mantell, Dr. Grant-Hall and Dr. Meier have each considered the interests of these children, and have each identified a specific need and desire for permanency, stability and structure in their young lives. Dr. Mantell has specifically indicated that given the security the children have developed living with Ethel and Richard K., they should not be moved from this placement. (Testimony of Dr. Mantell.) Dr. Grant-Hall has noted that given the ages of the children involved, permanency of placement should be given the highest priority in determining the children's best interests. (Testimony of Dr. Grant-Hall.)
The salient opinions of these experts are consistent with the other evidence which clearly and convincingly establishes that all of the children are receiving abundant loving attention, stability and guidance in their foster home. As discussed in Part I. C., above, the children are comfortably adjusted to their lives apart from Daniel S. and Cheryl A.: they are all happy to return to Ethel K.'s home following visits with their father. (Testimony of Daniel S.) Rebecca has clearly thrived while CT Page 6751 living with Ethel and Richard K.[66] While Katelyn continues to struggle in her interactions with peers, she has fortunately outgrown or overcome some disturbing behaviors, and is likely to continue to make good use of the individual counseling she receives. Tasha has also left behind her oppositional behaviors, and this bright, intelligent child now performs at an above average level in school, while developing healthy friendships with her peers. (Exhibit 16.) While Trevor has encountered difficulty with academic achievement, he is in the process of having his special needs defined and professionally addressed, largely as the result of Ethel K.'s advocacy. It is clear that this entire sibling unit is the fortunate beneficiary of organized, motivated, and committed foster parents who have been both willing and able to successfully weather the joys and vicissitudes of raising four young children.
Ethel and Robert K. have become very attached to Rebecca, Katelyn, Trevor and Tasha, and have indicated their desire to adopt the children. (Exhibit 16; Testimony of Ethel K., Sean M.) Adoption would be immediately welcomed by Rebecca, who is old enough to have voiced her understanding of this process, and who has clearly expressed her desire to become a permanent part of her foster family. (Exhibit 16; Testimony of Sean M.) Ethel K. has stated her intention to allow the children to contact their biological parents and Ryan after they are adopted: she recognizes that despite the difficulties they have encountered in the past, "they only have one Mom and Dad." (Testimony of Ethel K.)
The children's attorney has described their various positions regarding placement. As noted, Rebecca clearly wants to be adopted by Ethel and Richard K., and attributes her improvement in behavior and school performance to the care and guidance she has received in their home. Katelyn, Trevor and Tasha all express interest in remaining with their foster family, but also state, without realistic basis, that they would like to live with Cheryl A.[67] While all of the children are well bonded to Daniel S., it is significant that they have not voiced any desire to have him serve as their primary caretaker, or to live with him at this time: they would be pleased to have increased opportunities to visit with him, however, as he has played a consistent role in their lives. The children's counsel has sagely observed that given Daniel S.'s particular situation, and noting his continued need for a long period of sex offender therapy, requiring Rebecca, Katelyn. Trevor or Tasha to wait for him to be able to serve as a placement resource, would sacrifice their need and desire for permanency, and thereby effectively compromise the well-being of the children. Noting that it would be inappropriate to designate Cheryl A. as a potential primary caretaker, the children's counsel argued that termination of parental rights would meet the best interests of all four youngsters. CT Page 6752
Although the court is sensitive to Daniel S.'s obvious love for his children and acknowledges his representations that he has no feelings of a sexual nature for them at the present time, his status as the children's biological father must be viewed in the context of his sex offender history and the limited degree of his demonstrated rehabilitation, as described in Part II. B. 1., above.[68] In reSavanah M., supra, 55 Conn. App. 816. While the children view Daniel S. as a consistent figure in their lives, he has served as a valuable playmate,[69] rather than a source to whom they turn for advice, moral support, educational sustenance or other factors contributing to their essential growth and development. (Testimony of Dr. Mantell; see also Exhibits 2, 11.) It bears emphasis that Daniel S.'s rehabilitation process is expected to consume three to five years in all, meaning that the earliest date on which he will complete sex offender treatment is nearly one year away. (Testimony of Mr. Hobson; Exhibit G; see Part II. B. 1.)
In this case, allowing additional time for reunification with either biological parent does not present a reasonable option for the court, charged with the responsibility of addressing the best interests of the children. Rebecca, Katelyn, Trevor and Tasha have lived for over three years in a stable and loving foster placement, which now serves as their primary home. Since the cessation of their visits with Cheryl A., none of the children have made requests for additional opportunities to see her, apparently assuming that their relationship with their biological mother has come to an end. (Testimony of Sean M.) When the court assesses the weight of Daniel S.'s adult needs and his desire for reunification, along with his incomplete rehabilitation, against the best interests of Rebecca, Katelyn, Trevor and Tasha, it becomes clear that the precious reservoir of their childhood years should not be expended in waiting for their biological father to become able to serve as their parent.
Focusing upon the children's needs, the court must agree with the children's counsel and the three psychologists who have examined this family, and conclude that Rebecca, Katelyn, Trevor and Tasha require, and indeed deserve, stability of placement now, and not later. Their interests in sustained growth, development, well-being, and continuity and stability in their environment can best be served through termination of the respondent parents' parental rights, freeing these children for adoption. See In re Alexander C., supra, 60 Conn. App. 559; In re ShyinaB., supra, 58 Conn. App. 167.
 IV. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination CT Page 6753 of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the children's best interests to terminate the parental rights of Daniel S. and Cheryl A., accordingly ORDERS:
That the parental rights of Daniel S. and Cheryl A. are hereby terminated as to Rebecca S., Katelyn S., Trevor S. and Tasha S.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for all four children, for the purpose of securing an adoptive family where Rebecca, Katelyn, Trevor and Tasha are placed together, or other suitable permanent placement.
That the Commissioner of the Department of Children and Families note this court's recommendation that the children be facilitated in maintaining appropriate contact with their biological father, following adoption or permanent placement.
That within thirty days of this judgment a written report addressing such permanency plan shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.