IN RE ASHLEY S. ET AL.*
(AC 20655)

Lavery, C. J., and Landau and Pellegrino, Js.

Argued November 30, 2000—officially released February 6, 2001

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Kristen S.*, pro se, the appellant (respondent mother).

*Nina F. Elgo*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

LAVERY, C. J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her three children, A, J and N.[1] On appeal, the respondent contends that the decision of the trial court is not factually or legally supported by the record.[2] We disagree and, accordingly, affirm the judgments of the trial court.

In a comprehensive memorandum of decision, the trial court set forth the following facts and procedural

---

[1] On April 27, 1999, the respondent father voluntarily consented to termination of his rights, and the court rendered judgments terminating his parental rights with regard to all three children. He has not appealed from those judgments. We refer in this opinion to the respondent mother as the respondent.

[2] The pro se respondent has actually listed thirty six issues in her brief. These issues are not separately analyzed and, in essence, assert that the court's decision is not supported by the record. "Although we will not entirely disregard our rules of practice, we do give great latitude to pro se litigants in order that justice may both be done and be seen to be done." (Internal quotation marks omitted.) *Lo Sacco* v. *Young*, 20 Conn. App. 6, 9, 564 A.2d 610, cert. denied, 213 Conn. 808, 568 A.2d 793 (1989).

history. On March 24, 1997, the commissioner of children and families (commissioner) filed neglect petitions alleging that A, J and N were neglected. On that date, the court granted an order of temporary custody with regard to all three of the children. On April 27, 1998, the court adjudicated the children neglected and committed them to the care and custody of the commissioner. The children originally were committed to the custody of the commissioner because the condition of the respondent's home was unsafe for the children and because the respondent lacked the necessary parenting skills to feed, bathe and supervise the children.

The department of children and families (department) offered the respondent numerous services to aid with reunification, including parenting classes and programs, job training and job placement programs, numerous psychological and psychiatric evaluations, and supervised visitation with parent education components.[3] The respondent was evaluated by many psychologists and psychiatrists. On the basis of these evaluations, the department repeatedly attempted to determine what the respondent's mental health issues were and how best to address her problems.

In 1997, Robert Meier, a psychologist, performed an individual psychological evaluation of the respondent

---

[3] Specifically, the court found that the respondent was provided individual therapy at North Central Counseling and Support Connections, now known as North Central Counseling Services (NCCS); Psychiatric Services; NCCS young parents' support group; South Windsor human services parenting classes; Literacy Volunteers America GED preparation; town of Enfield board of education GED preparation classes; town of Enfield job placement and training program; New Britain YMCA play group; Dialectical Behavior Therapy Group; NCCS Parenting with Care; Psycho Educational Group; psychological, parenting and psychiatric evaluations; a diagnostic cognitive processing and educational achievement evaluation; a supervised visitation program at NCCS, which included hands-on parenting education; supervised visitation at AMPS, Inc., which included individualized parenting instruction; and supervised visitation by the department.

and an interactional evaluation with the respondent and her children. Meier found that the respondent had trouble setting limits for the children, that her parenting style demonstrated little sensitivity to the children's developmental level or feelings, and that her interventions were inconsistent, not well timed and not adequately specific or concrete.

In 1998, Marvin Zelman, a psychiatrist, performed a psychiatric evaluation of the respondent, which consisted of separate interviews with the respondent and the children, and a family session with the respondent and the three children together. In June, 1998, Zelman made a provisional diagnosis of mixed personality disorder and learning disability, and recommended that the respondent engage in psychological testing to help establish a specific cognitive diagnosis. This testing subsequently was performed by the Institute of Living. Zelman testified that the results of these tests confirmed his diagnosis of personality disorder and learning disability. He testified that the respondent's mental health problems reduce her ability to parent because she has very limited tolerance, is easily angered, acts out on her impulses and conducts herself improperly. Zelman recommended that the respondent engage in psychotherapy, which is a service that the department provided to the respondent through North Central Counseling Services (NCCS).

In July, 1998, the department asked Kathleen Bradley, assistant research professor at the A.J. Pappanikou Center for Disabilities Studies at the University of Connecticut, to perform a diagnostic cognitive processing educational achievement evaluation of the respondent. The purpose of this evaluation was to assess the cognitive abilities of the respondent and to help determine the best methods to assist her in learning parenting skills. The department subsequently met with the respondent and her counsel to identify goals and to

reassess proper services for the respondent. Goals were set at this meeting, and Bradley's recommendations were sent to Ann Tuller at AMPS, Inc., who incorporated the recommendations into AMPS parent training with the respondent.

The court found, on the basis of the foregoing, that there was an ongoing effort by the department to assess the respondent's mental health issues and to attempt to address those issues by providing appropriate services. The court further found that in addition to the above services, the department arranged for the respondent to engage in individual and group therapy. From April, 1997, through October, 1998, the respondent engaged in therapy with Joan Prior from NCCS. Upon the respondent's discharge from this program, Prior described the respondent as depressed, anxious, lacking structure, engaging in poor self-care and showing disregard for harmful consequences. Prior recommended that the respondent engage in a dialectical behavioral therapy (DBT) group, which the respondent began in November, 1998. In the spring of 1999, the respondent also began individual therapy with Susan Fitzpatrick, another therapist at NCCS. Fitzpatrick testified that when she began seeing the respondent, she found her to be impulsive and depressed, and diagnosed her with a mood disorder and attention deficit disorder.[4]

With regard to reunification, the court found that the department offered the respondent multiple visits on a weekly basis with her children. Specifically, between August, 1997, and January, 1998, the respondent attended a YMCA play group with J where she was able to observe two teachers and model their behavior. Between April and July, 1997, the respondent visited

---

[4] Fitzpatrick also testified that the respondent's medications were changed in June, 1999, to include lithium and that, since that time, she had observed gradual progress and more effective functioning by the respondent.

with N in his foster home. From August, 1997, through June, 1998, the respondent was able to visit with N and A once a week under the supervision of the department, and she was provided feedback during these visits by the supervising department worker. Between November, 1997, and September, 1998, the respondent was able to visit with all three of her children together on a weekly basis under the supervision of Penny Lemery from NCCS. Lemery provided the respondent with one-on-one parenting instruction during the visits and with feedback after the visits. The respondent requested that the supervised visitation with Lemery cease because the respondent perceived a personality conflict. The respondent was then offered supervised visitation, with a parent education component at AMPS, Inc., between September, 1998, and March, 1999. During these visits, the staff at AMPS, Inc., continued to work with the respondent to teach her proper parenting techniques. The court found that, despite the enormous resources that were utilized to provide the respondent with hands-on parenting instruction and education, the respondent's ability to parent the children safely, if anything, deteriorated over time.[5]

On March 2, 1999, the commissioner filed petitions for termination of parental rights of the respondent.

[5] Specifically, the court noted Lemery's testimony that the respondent had difficulty understanding the children's level of development and that the respondent was inconsistent, needed to be told to get off the couch to play with the children, brought inappropriate food and set inconsistent boundaries. This was consistent with the testimony of the department workers who supervised other visits with the respondent. The court stated that when the respondent was referred to AMPS, Inc., in September, 1998, it was apparent that she could not adequately take care of her children during a one hour visit, much less parent the children full-time. The court noted that the situation deteriorated to the point where AMPS personnel were forced to shadow the respondent around the room as she visited with the children, and staff had to intervene in thirteen out of twenty-three visits to address safety issues. AMPS recommended in March, 1999, that visitation cease between the respondent and her children because of her problems parenting the children and the detrimental effect the visits were having on the children.

The petitions alleged that the children had been found in a prior proceeding to have been neglected and that the respondent had failed to achieve such a degree of rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. See General Statutes § 17a-112 (c) (3) (B).[6] The court terminated the parental rights of the respondent on the basis of § 17a-112 (c) (3) (B) for the failure of the respondent to achieve personal rehabilitation. This appeal followed.

"The standard for review on appeal [in a termination of parental rights case] is whether the challenged findings are clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Alissa N.*, 56 Conn. App. 203, 207, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000).

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition.

---

[6] General Statutes § 17a-112 (c) provides in relevant part: "The Superior Court, upon hearing and notice . . . may grant a petition [to terminate parental rights] . . . if it finds by clear and convincing evidence . . . (3) that . . . (B) the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

. . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 197, 204, 763 A.2d 45 (2000).

"Section 17a-112 (c) (3) (B) allows for the involuntary termination of parental rights when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life." (Citations omitted; internal quotation marks omitted.) *In re Stanley D.*, 61 Conn. App. 224, 229–30, 763 A.2d 83 (2000). "The statute does not require the parent to be able to assume full responsibility for a child, without the use of available support programs. . . . Our Supreme Court has held that § [17a-112] (b) (2) [now § 17a-112 (c) (3) (B)] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Citation omitted; internal quotation marks omitted.) *In re Deana E.*, supra, 61 Conn. App. 212.

After reviewing the court's decision and the record, we conclude that there was sufficient evidence to support the court's conclusion, by clear and convincing

evidence, that the respondent has failed to achieve personal rehabilitation. Specifically, the record supports the court's conclusion that the respondent has not benefitted from the numerous services provided by the department to reunite her with her children. The court considered numerous exhibits, including the social study for termination of parental rights, dated February 26, 1999, which states, in part, that the "[respondent] has demonstrated that she is unable to care for her three children with specialized needs during her weekly visitation with them. She has visited them in highly structured settings for almost the past two years and has not shown an improvement in her parenting ability or in her knowledge of the children's needs."[7] This is consistent with the other evidence considered by the court.[8]

The court noted that the respondent had participated in the psychological and psychiatric evaluations that were scheduled for her and that she visited with the children. As the court correctly noted, however, "[t]he issue . . . is not attendance at these services, but instead, whether, as a result of participating in these services, she can assume a responsible position in the lives of the children within a reasonable time." The court's conclusion that the respondent had not benefitted from the services and that she had not demonstrated

[7] The social study further states that the "[respondent] has made little progress in changing her circumstances which would permit the children to safely return to her care. Evaluations and services have been provided to [the respondent] in order for her to become better able to parent her children. Despite these efforts, [the respondent] has not rehabilitated to the point where she can care for her children. Each of the children have specialized needs and require a caregiver who can respond effectively to their needs."

[8] For example, when Prior discharged the respondent from therapy, she stated the following in her discharge notes: "Slight progress. Frequent 'crisis' calls. Legal problems. Angry outbursts. [The respondent] exhibits sig[nifi-cant] denial over her individual dysfunctions."

progress in her ability to parent the children within a reasonable time was not clearly erroneous.

We further conclude that the record supports the court's finding, by clear and convincing evidence, that termination of the respondent's parental rights was in the best interests of the children.[9] The court stated that the children "are closely bonded with their foster parents, who have provided them with loving and structured home environments. [A], in particular, is desperately in need of a highly structured, consistent environment which [the respondent] cannot provide even in a one hour visit. [N] has been in foster care his entire life, and [J] is an insecure child who has been able to articulate his desire to remain with and have the same last name as his foster family." On the basis of our review of the record, we conclude that the court's finding that termination of the respondent's parental rights was in the best interests of the children was not clearly erroneous.

It is clear that the respondent loves her children and wants them back. As the court accurately stated, however, "[a] parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to these children because she cannot provide them a nurturing, safe and structured environment." We genuinely sympathize with the respondent and acknowledge her sincere efforts at rehabilitation. See *In re Eden F.*, 250 Conn. 674, 707–708, 741 A.2d 873 (1999). We conclude, however, that the court's findings support its conclusions, are legally correct and, thus, are not clearly erroneous.

[9] "[General Statutes] § 17a-112 (c) requires that to terminate parental rights, the trial court must find by clear and convincing evidence that termination is in the best interest of the child." *In re Shyliesh H.*, 56 Conn. App. 167, 176, 743 A.2d 165 (1999).

See *In re Deana E.*, 61 Conn. App. 185, 195, 763 A.2d 37 (2000).

The judgments are affirmed.

In this opinion the other judges concurred.