MEMORANDUM OF DECISION
On January 4, 2001 the Department of Children and Families (DCF) filed petitions[3] to terminate the parental rights of Teresa M and Donald (a.k.a.) Frank F father of Christopher and "John Doe", father of CT Page 2904 Napoleon.[4] The respondent parents were properly served with the petitions and Ms. M and Mr. F were represented by counsel throughout the court proceedings.[5] This court has jurisdiction in this matter and there is no pending action affecting custody of the children in any other court. The court, Esposito, J. commenced trial on November 26, 2001 but a mistrial was declared. The court, Conway, J. commenced trial on January 31, 2002, continued trial on February 21, 2002 and concluded trial on March 4, 2002.[6] The statutory ground alleged as to the respondent mother, regarding both boys, is a failure to rehabilitate and as to Napolean, who was under the age of seven, a prior termination of her parental rights as to another child.[7] The statutory grounds alleged as to Mr. F are abandonment, failure to rehabilitate and no ongoing parent-child relationship.[8] The statutory ground alleged as to John Doe is abandonment.
The court makes the following findings of fact and conclusions of law by clear and convincing evidence.
Christopher was born May 1992 and Napolean on January 1994. Christopher was Ms. M's sixth child and Napolean her seventh child. of respondent mother's five older children, one died at age four months from pulmonary complications and her parental rights were terminated as to the other four children.[9]
Christopher and Napolean first came into foster care in 1998 as a result of a ninety six hour hold and then an order of temporary custody which was signed on December 3, 1998. Ms. M was hospitalized for mental health issues and the boys were homeless.[10] Christopher and Napolean were returned to Ms. M's care in December of 1998 under an order of protective supervision. Throughout 1999, Ms. M struggled with the court ordered specific steps. DCF filed a motion to modify the order of protective supervision to commitment. Before the court could act on the motion to modify, a second order of temporary custody was obtained in November of 1999, due to Ms. M's incarceration. The motion to modify the protective supervision to commitment was granted in February of 2000. Christopher and Napolean continue to remain committed to DCF to date.
Ms. M's mental health issues date back to her teenage years. Ms. M suffers from a paranoid personality disorder.[11] She has required at least five hospitalizations since the age of fourteen years because of mental health issues.[12] Ms. M has been treated for threats of violence, suicide gestures, depression, anorexia nervosa and paranoia.[13] Respondent mother has borderline intellectual functioning. Ms. M has a minimal criminal record. She has been on probation in the past and was briefly incarcerated in 1998 and again in late 1999. CT Page 2905
Reasonable Efforts Findings
DCF made reasonable efforts to locate Mr. F. Ms. M refused to give information about Mr. F, except that he resided in Bronx, New York. He was eventually located and genetic testing, in May of 2001, determined that Mr. F was the father of Christopher but not the father of Napolean. In May of 2001 the court appointed an attorney to represent Mr. F According to State's exhibit K, p. 3, in June of 2001, Mr. F was trying to decide whether he was going to consent to the termination of parental rights petition. He did give genetic information to DCF at that time. In July of 2001, counsel for Mr. F represented it was Mr. F's intent to consent to the termination of parental rights petition. When Mr. F failed to appear for trial on November 26, 2001 he was defaulted.
DCF made reasonable efforts to locate John Doe, putative father of Napolean. Ms. M refused to acknowledge that Mr. F was not Napeolean's father. She refused to discuss alternative potential fathers. DCF had no where or nothing else to go on to determine and locate Napolean's biological father.
DCF made reasonable efforts to reunify the respondent parents with their children.
The repeated theme in Ms. M's life is the severe degree of paranoia she suffers from and her failure to successfully engage in any effective treatment. Ms. M's illness and the adverse impact it has had on Christopher and Napolean is best exemplified by Ms. M's adamant belief that both she and her apartment, visible to a police substation, was being spied on by the police. Her preoccupation with her proximity to the police substation resulted in her and the boys living in squalor. Ms. M did not provide Christopher and Napoleon with adequate clothing, food, supervision, or housing because all of her efforts and attention were directed at the belief that the police were spying on her.[14]
DCF made referrals to address Ms. M's mental health issues. Page 8 of State's exhibit I lists the sixteen various agencies, hospitals and programs that had been enlisted to address and treat Ms. M's illness. Services go back to 1997. Ms. M refused to engage in any substantive sustained treatment or work with any of the service providers.
Visitation with her children was offered when the boys came into foster care. Ms. M refused to visit with the boys from November of 1999 through January of 2000. Ms. M visited with her sons in February of 2000. She was inappropriate during the visit. Ms. M refused to visit with the boys again, until July of 2000, because they had received haircuts. Visits resumed in July of 2000 but were suspended in October of 2000. At the CT Page 2906 October 30th visit Ms. M began yelling and after being informed if she did not calm down the visit would end, Ms. M stormed out of the office. Visits ceased because of Ms. M's disruptive behavior, because of deteriorating behavior of the boys after their visits with Ms. M and Ms. M's refusal to engage in mental health treatment.
Court ordered specific steps were ordered on three different occasions, in December of 1998, in May of 1999 and in September of 1999. (See State's exhibits F, G, and H) There was a concerted effort by DCF and service providers up to late 1999, to keep Christopher and Napolean in their mother's care with intensive family preservation services and referrals for Ms. M to obtain mental health treatment. Respondent mother was noncompliant with service providers, with the specific steps, and as will be discusses in greater detail later in this opinion, with obtaining and benefitting from mental health treatment.
Mr. F was unwilling to benefit from reunification efforts. Mr. F even after genetic testing confirmed he was the father of Christopher, would not consider himself as a resource for Christopher. His apparent intention, up until his nonappearance at trial, was to consent to the termination of his parental rights.
John Doe's identity and whereabouts is unknown. He is therefore unable to benefit from reunification efforts.
ADJUDICATION
 Abandonment
The statutory ground of abandonment is proven when a parent "has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of [a] child." C.G.S. § 17a-112 (j)(3)(A). Mr. F has had no visits or even contact with Christopher since the child came into foster care in 1999.[15] Mr. F has clearly abandoned Christopher and John Doe has abandoned Napolean. Neither respondent father visited his respective son, displayed love or affection for his respective son, had any personal interaction with his respective child, or displayed any concern for his own son's welfare. In re Kezia M., 33 Conn. App. 12, 17-18cert. denied., 228 Conn. 915 (1993).
No Ongoing Parent-Child
There is no ongoing parent-child relationship when the "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child has not formed. C.G.S. § 17a-112 (j)(3)(D). Clearly there is no CT Page 2907 parent-child relationship between Mr. F and Christopher. The respondent father has not seen Christopher at least since 1999. Christopher does ask for Mr. F. To allow further time to elapse to see if a parent-child relationship could be established would be detrimental to Christopher's best interest. Mr. F's failure to come forward to be a resource for Christopher and his decision to not appear at trial clearly indicates that Mr. F has no interest in being a parent to Christopher. Allowing further time to elapse will not change that sad reality.
Failure to Rehabilitate
Statutory grounds exist to terminate a parent's parental rights when a child has been found by the superior court to have been neglected or uncared for in a prior proceeding and the parent failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of a child. C.G.S. § 17a-112 (j)(3)(B). In analyzing a respondent parent's rehabilitative status the court must look at the "status as it relates to the needs of the particular child, and further, such rehabilitation must be foreseeable within a reasonable time." (Citation omitted). In reRoshawn R., 51 Conn. App. 44, 54-55 (1998).
Mr. F has failed to take the necessary steps to become a responsible parent to Christopher. Giving Mr. F further time to attempt to establish a responsible parenting position in Christopher's life is pointless given Mr. F's decision not to be a resource to Christopher.
Ms. M's love and biological connection to her sons is simply not enough to compensate for her significant mental health issues and her failure to engage in prolonged, productive treatment. In re Ashley S.,61 Conn. App. 658, 667 cert. denied, 255 Conn. 950-951 (2001). The tragedy is that it is Ms. M's mental illness, specifically her paranoia, that prevents her from engaging in treatment.
The most recent failed attempt to engage Ms. M in treatment clearly exemplies why rehabilitation has not and in all probability will not occurred. An attempt to engage Ms. M in mental health treatment was initiated by Ms. M's attorney in the spring of 2001.[16] Mr. Robert Page, a licensed social worker and the executive and clinical director of the Dixwell Newhallville Mental Health Center, began treating Ms. M in April of 2000. Mr. Page saw Ms. M eight times. Initially she engaged in the therapy sessions. Mr. Page testified that it was essential that Ms. M establish and maintain a relationship with a therapist because medications alone would not adequately address her Paranoid Personality Disorder. In June of 2000, Mr. Page met with Ms. M and the property CT Page 2908 manager of her apartment, to attempt to help her obtain a new living unit, due to the deplorable condition of her apartment and its proximity to the police substation. As Mr. Page tried to intervene on Ms. M's behalf with the property manager, her paranoia escalated and she became distrustful of Mr. Page. A new potential living unit was secured for Ms. M one that was out of sight from the police substation. Instead of being relieved to be away from the police substation Ms. M became more suspicious and uncomfortable. Her escalating paranoia regarding her relationship with Mr. Page and her intolerance to not knowing exactly how long she would need to stay in treatment led her to tell Mr. Page that she no longer needed or wanted treatment. The Dixwell Newhallville Mental Health Clinic and specifically Mr. Page, was never able to convince Ms. M to begin on medications that might have reduced her anxiety to that she could remained engaged in treatment.
Ms. M did attend counseling sessions at Catholic Family Services. She completed six initial sessions by January of 2000. It was recommended that she go for follow up counseling at Greater New Haven. Ms. M apparently did not attend follow up treatment at Greater New Haven but instead, in January of 2001 she re-enrolled herself at Catholic Family Services for an additional six sessions of counseling. Ms. M was discharged after four sessions due to a lack of "commitment to counseling goals and objectives for change." (State's exhibit C).[17]
It is not foreseeable in a reasonable period of time that Ms. M's long standing opposition to treatment will change. None of the experts who testified at trial had any insight or recommendations as to how to circumvent Ms. M's paranoia long enough to get her to successfully engage in mental health treatment. It is a "Catch 22", in that without treatment it is probably not possible for Ms. M to recognize that she is sick and therefore in need of treatment. Without effective treatment, her paranoid personality disorder will preclude her from being able to properly parent any child. The statutory ground of failure to rehabilitate has been proven.
Prior Termination
Subsection E of C.G.S. § 17a-112 (j)(3) authorizes termination of a parent's parental rights "if the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families." CT Page 2909
Napolean, had previously been adjudicated neglected and was under the age of seven at the time of the filing of the termination of parental rights petition. As indicated previously Ms. M had her parental rights terminated on four of her other children.[18] Ms. M, as discussed previously, has failed to rehabilitate and to allow further time to elapse to see if rehabilitation might occur in the foreseeable future is not in Napolean's best interest. The statutory grounds alleged in subsection G of 17a-112 (j)(3) has been proven by clear and convincing evidence.
In the dispositional phase of a parental rights termination case, the court must consider whether DCF has proven by clear and convincing evidence that `termination is in the best interest of the child.' It is in both Christopher's and Napolean's best interest to have their parents' parental rights terminated.
In accordance with C.G.S. § 17a-112 (k) the court makes the following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. This court has already discussed the extensive services and programs offered to respondent mother to facilitate reunification. Mr. F refused all proffers by DCF to be a potential resource for Christopher. John Doe's unknown identity and whereabouts made it impossible to offer any services to him.
(2) DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
(3) There were three sets of court ordered specific steps as to respondent mother. There was virtually no compliance by Ms. M with the specific steps. She would not allow intensive family preservation workers into her home. She did not remain engaged in mental health treatment. Ms. M refused to attend a second court ordered competency evaluation that was requested by respondent mother's counsel. At the court ordered parent-child interactional and psychological evaluations, Ms. M was belligerent and disruptive and refused to complete the evaluation process. (State's exhibit L).
(4) The emotional ties of Christopher and Napolean to Ms. M and to their foster family needs to be examine.
Both boys told Dr. Grenier, at the court ordered evaluations which took CT Page 2910 place in April of 2001, that their mother told them she did not want them and she told them she was sick. Both boys believe their mother lied about being sick and she just does not want them anymore. Christopher does not ask about his mother and has indicated he wants to stay permanently with his foster mother who wants to adopt him.
Regarding Napolean, Dr. Grenier concluded that: "Napolean still shows emotional attachment to his mother, but he is clearly the one more affected by her emotional problems. Thus, continuing a relationship with her puts him at-risk for future emotional problems and could be serious." (State's exhibit L, pp. 4-5).
The boys' foster mother is interested in adopting both of the boys. Christopher desires to be adopted by his foster mother. Napolean told Dr. Grenier that he would like to stay with his foster mother but not for very long. When asked how long would be long enough to stay in foster care, Napolean stated until he was nine years old at which time he wants to return to his mother's home. (State's exhibit L p. 2). Given Dr. Grenier's concerns regarding continued contact between Napolean and Ms. M and Ms. M's intractable position regarding treatment Napolean's wish to return to his mother's home cannot be realized. Hopefully, the, bond that exists between Napolean and his foster mother will continue to grow and will eventually allow Napolean to want the same permanency with his foster mother that Christopher desires. Both boys continue to attend weekly counseling sessions.
(5) Christopher is almost ten years old and Napoleon is eight years old. They deserve to leave the limbo of foster care and attain permanency in adoption.
(6) Obviously Mr. F and John Doe have made no efforts to adjust their circumstances, conduct, or conditions to make it in the best interest of either child to return to their father's care in the foreseeable future.
Ms. M's attempt to engage in the requisite mental health treatment has been sparse and ineffective. Her refusal to visit with the boys after they received haircuts and her disruptive, antisocial behavior toward DCF and service providers and evaluators, are all behaviors attributable to her untreated paranoid personality disorder.
(7) This court is unaware of any agency or individual or economic circumstances which has prevented Mr. F from maintaining a meaningful relationship with Christopher. Arguably, Ms. M's refusal to accept the fact that Mr. F is not Napolean's father has precluded John Doe from maintaining a meaningful relationship with Napolean. Given the unknown identity and whereabouts of John Doe, however, Ms. M's failure to CT Page 2911 disclose the identity of Napolean's biological father, does not alter this court's disposition.
There is no individual, agency or economic circumstance that has prevented Ms. M from maintaining a meaningful relationship with Christopher and Napolean. As indicated previously, it is Ms. M's unwillingness and inability to engage in and benefit from mental health treatment that requires this court to find that it is in both boys' best interest to terminate Ms. M's parental rights.
CONCLUSION
Based on the foregoing findings, this court has determined that it is in the best interest of Christopher and Napolean to terminate respondent parents' parental rights. Accordingly, the court hereby grants the amended termination petitions. The court orders that the Commissioner of DCF is appointed statutory parent for the children. The Commissioner shall file with the court, no later than thirty days following the date of judgment, a written report of efforts to effect a permanent placement for Christopher and Napolean and file further reports as required by state and federal law. The court on this date is therefore approving the permanency plan of termination of Ms. M's, Mr. F's and "John Doe"'s parental rights and adoption. Said plan is a reasonable plan and DCF has made reasonable efforts to effectuate the plan.
Bernadette Conway, Judge of the Superior Court