[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
These petitions concern Timothy D., who was born on August 1999. His mother is Lisa D. On August 31, 1999, the petitioner Commissioner of the Department of Children and Families (department); obtained an order of temporary custody to Timothy. On the same day the department filed a petition alleging that the child was neglected and uncared for with specialized needs. At that time, mother was married to David D. and he was given notice of the proceedings as the legal father. Mother alleged, however, that David D. was not the biological father of Timothy. She claimed that an Edward K., living in Texas, was the boy's biological father. He was given notice of the proceedings as a putative father. Edward K. never appeared in court, and he was defaulted. Mother and David D. appeared in court, and were appointed separate attorneys. On February 1, 2000 mother and David D. filed pleas of nolo contendere, which resulted in an adjudication that Timothy was uncared for with specialized needs, and a disposition of commitment to the department until February 1, 2001. David D. did not acknowledge paternity, but did express a willingness to be considered a custodial resource with mother.
On June 20, 2000, following an evidentiary hearing at which mother, David D., and their respective attorneys participated, the court found that David D. was not the father of Timothy D. All orders as to David D. were vacated, and the petition was withdrawn as to David D. by the department.
On December 5, 2000 Timothy's commitment to the department was extended until February 1, 2002. At that hearing, the court found that reasonable efforts to reunify the child with either mother or Edward K. were no longer appropriate, and approved a permanency plan calling for a transfer of guardianship to maternal grandmother.
On March 29, 2001, the department filed a petition seeking to terminate the parental rights "of mother and Edward K. the department alleged a failure to rehabilitate by mother. As to Edward K., the petition asserts as grounds abandonment as well as no ongoing parent-child relationship. CT Page 16085 Mother appeared and was appointed counsel. Edward K. failed to appear; notice was found; he was defaulted.
The child's commitment to the department expired by operation of law on February 1, 2002. The child's physical custody remained the same. On July 26, 2002, the department obtained a new order of temporary custody, and filed a new petition alleging the child was neglected and uncared for with specialized needs. Mother appeared, did not contest the temporary custody order, and was appointed the same attorney for the new petition. Edward K. did not appear. The marshal's return indicated that notice had been sent to Mr. K. by certified mail, but no proof of service was ever provided. The new petition was consolidated for trial with the termination petition.
At the trial the department presented the testimony of three witnesses: Amy Quinn-Calhoun and Deborah Mansfield, both social workers for the department, as well as the child's foster mother. The department introduced eight exhibits. Mother testified on her own behalf, and introduced into evidence a report from a former therapist of mother's.
II. BURDEN OF PROOF AND PROCEDURE
 A. Procedure on the Petitions
When neglect and termination proceedings are coterminous, the court is required to proceed in three separate stages: (1) Adjudication of the Neglect Petition; (2) Adjudication of the Termination Petition; and (3) Disposition of Both Petitions.
 (1) Adjudication of the Neglect Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition is deferred until a decision is made on the termination petition.
 (2) Adjudication of the Termination Petition
The court must determine next whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parent's rights, as of the date of the filing of the petition or as of the date of its last amendment. If no such ground for termination is found, CT Page 16086 the court must proceed on the neglect petition and consider an appropriate disposition. If at least one alleged ground to terminate is found, however, the court must move on to the third stage.
 (3) Disposition of Both of the Petitions
If grounds have been found to adjudicate the child neglected or uncared for, and to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial establish, by clear and convincing evidence, after consideration of the factors enumerated in § 17a-112 (k), as amended, that termination is in the child's best interest.
III NEGLECT PETITION
To properly address the neglect petition, its context must be understood. This petition is the result of an oversight in the department's failure to file a motion to maintain commitment. Since the original order of temporary custody, entered when the child was three days old on August 29, 1999, the child has remained in the department's care and custody. The issues which existed on February 1, 2002 (the date commitment expired by operation of law); were the issues which presented themselves throughout the period of commitment: mother's instability in her mental health, domestic affairs, and judgment. In his initial evaluation dated September 28, 1999, Dr. Freedman opined that mother had ". . . a personality marked by periods of depression, substantial personality and interpersonal problems, and a high level of instability.' He further stated that mother ". . . showed signs of extreme self-absorption, and severe difficulties in getting along with and establishing stable relationships with people." At this time mother was embroiled in a stormy domestic relationship with her husband, who was not the child's biological father. As a couple, they had already lost custody of their child, the older step-brother of Timothy. Within a few months prior to the initial evaluation, mother had made plans for Timothy's adoption, for reconciliation and custody with Timothy's putative father, and for reconciliation and custody with mother's husband. This last named plan was in effect at the time of Dr. Freedman's initial evaluation. Dr. Freedman recommended individual counseling for mother, as well as couples counseling with her husband, and parenting training. These recommendations were incorporated in the specific steps ordered by the court on February 1, 2000, the date of the child's uncared for adjudication.
Dr. Freedman provided an updated evaluation dated July 14, 2000, in which he opined that mother ". . . continued her pattern of relationship CT Page 16087 problems and instability . . . seemed impulsive and to sometimes show poor judgment." He did state that mother's ". . . personality testing did not indicate signs of serious mental or emotional problems . . .", but opined that the continuance of mother's issues were ". . . potentially jeopardizing the care of any infant in her care." He recommended against reunification unless mother had established stability in her personal life, and for further counseling despite mother's claim that she had been discharged successfully from counseling. On December 5, 2000 the child's commitment was extended until February 1, 2002.
Mother's counseling history is instructive. She began counseling with Rosemarie Neilson at the Backus Hospital Center for Mental Health on July 9, 1999, after an intake session on May 12, 1999. She attended two individual sessions prior to Timothy's birth. During the seven months following his birth, mother attended two individual sessions. She also attended three couples sessions with her husband. Her therapist found mother strongly motivated to reunite with her son and her husband. Mother was committed to reunification; her husband was not. Mother had an individual session on February 2, 2000. Mother and her husband had their last couples session on February 22, 2000. Mother had an individual session on March 29, 2000. On July 8, 2000 mother's therapist closed her case due to lack of contact from mother or her husband. Mother claims she was discharged successfully, but for a financial inability to schedule a final closing session. The report of mother's therapist does not support this interpretation, and the court does not find mother's assertion credible. Mother later told Dr. Freedman that she and her husband separated in May, 2000. On November 3, 2000 mother returned to Ms. Neilson for a new intake session, which mother said was motivated by court mandate. Over the next six months nine individual sessions were scheduled. Mother attended two, on February 7, 2001 and March 28, 2001. Ms. Neilson terminated her case after the seventh missed session scheduled for May 24, 2001, and reported that mother had divorced her husband. Further mother had disclosed increased legal involvement, a suspension from employment, and a termination of her parental rights. Ms. Neilson found mother's prior energy and drive no longer evident.
Mother subsequently sought treatment with Sherry Hansley at New London Counseling Associates with an initial session on November 15, 2001. Treatment was discontinued after mother attended only four out of eleven appointed sessions. After these sessions, in January of 2002, Ms. Hansley diagnosed mother with adjustment disorder with mixed disturbance of emotions and conduct, and with an antisocial personality disorder.
As of February 1, 2002, mother had not cooperated with counseling and had not successfully met her mental health needs. During the period from CT Page 16088 August 31, 1999 through February 1, 2002 mother was unable to maintain steady employment nor stable housing. She became involved with a succession of roommates, lived repeatedly at different addresses, including campgrounds, a rooming house, and with her boyfriend's parents. Her most consistent address was with her boyfriend's parents, but they were so unsupportive of mother's custodial claim that they would not allow her to provide their telephone number to the department. Mother also was arrested three times between December 3, 2000 and November 24, 2001, and was sentenced on November 28, 2001 to one year in jail, suspended, with eighteen months of probation.
Mother not only failed to cooperate with her specific steps to improve her chance at rehabilitation and reunification, but, as demonstrated, she regressed. Her situation and circumstances worsened. Thus, as of the date of the neglect petition, July 26, 2002, the petitioner has proven by the fair preponderance of the evidence that the child would be neglected if returned to mother in that he would be denied proper care and attention, physically, emotionally or morally, and that he would be permitted to live under conditions, circumstances or associations injurious to his well-being.
As to putative father, Edward K., the evidence establishes that he was aware of the existence of the child and the claim of his paternity. He placed a telephone call to the department worker, Ms. Quinn-Calhoun, acknowledging receipt of the neglect/uncared for petition. He left no telephone number for a return call, no other contact information, and has failed or refused to respond to any efforts at communication by the department. He has never made any other inquiry regarding the child. Though non-custodial at the time of the order of temporary custody and petition, he clearly is not a resource.
Accordingly, the first step, adjudication of the child as neglected by the fair preponderance of the evidence has been established by the petitioner, and is so found by the court.
IV TERMINATION OF PARENTAL RIGHTS PETITION
Having determined the child neglected, the court must now decide if the petitioner has proven by clear and convincing evidence that the alleged grounds for termination of parental rights existed as of the filing date of the petition, March 29, 2001.
Initially, the court finds by clear and convincing evidence that on December 5, 2000 the court found. pursuant to § 17a-112 (j)(1); that further efforts at location of or reunification with either parent were CT Page 16089 not appropriate.
With respect to mother, the department alleges a failure to rehabilitate. Section 17a-112 (j); (3)(B); "allows for the involuntary termination of parental rights when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; internal quotation marks omitted.). In re Stanley D., 61 Conn. App. 224, 229-30,763 A.2d 83 (2000). "The statute does not require the parent to be able to assume full responsibility for a child without the use of available support programs. . . . Our Supreme Court has held that § [17a-112] (b)(2); [now § 17a-112 (j)(3)(B)] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Citation omitted; internal quotation marks omitted.); In re Ashley S., 61 Conn. App. 658, 665,769 A.2d 718 (2001); cert denied, 255 Conn. 950, 769 A.2d 63 (2001).
Mother was provided specific steps to foster reunification on February 1, 2000, the date of the child's initial commitment. They included, in part, that mother participate in parenting, individual, and family counseling, and make progress toward the identified treatment goals; secure and maintain adequate housing; visit the child as often as permitted; and cooperate with in-home services recommended by the department. The court found by the fair preponderance of the evidence, in Part III, that the child would be neglected if returned to mother because of her failure to address successfully any of these concerns as of July 26, 2002. The court finds by that these Part III findings as to failures to rehabilitate by mother were proven by clear and convincing evidence by the petitioner as of March 29, 2001, the date of the termination petition. Mother began counseling at the Backus Hospital Center, as noted, and was discharged unsuccessfully for her failure to attend. Mother's claims of successful discharge are not credible, regardless of the standard of proof applied. Mother was noncompliant with the second CT Page 16090 session arranged with Ms. Neilson at Backus Hospital as of March 29, 2001, having missed five of seven scheduled sessions. Mother was unable or unwilling to maintain stable housing as previously discussed. The department offered mother an opportunity to participate in the Thames River assisted living program, which would promote and accelerate reunification efforts, but mother refused.
Mother began visiting the child frequently, and well, at the Madonna Place, and was progressing toward unsupervised visits until she threatened to take her child and run. Mother then became sporadic in her visitation, often tardy or missing visits altogether. The visits deteriorated to the point that the child was assaultive toward mother.
Given all of mother's failures, and the child's demonstrated feelings toward mother, the court finds by clear and convincing evidence that mother has failed to rehabilitate and that she can not assume a responsible position in the life of her child within a reasonably foreseeable time.
As to putative father, the petitioner claims that he abandoned his child, or that there exists no parent-child relationship and allowing time to establish such a relationship would be detrimental to the best interest of the child. The court finds that both were proven by clear and convincing evidence.
Mother asserted that Edward K. fathered the child in Texas while she and he lived together during a period when mother was separated from her husband. Mother relocated to Connecticut approximately six months prior to the child's birth. Since that relocation, the only evidence of any communication from putative father concerning the child was that he left a voice mail for Ms. Quinn-Calhoun acknowledging receipt of the original petition. He left no telephone number for a return call, and he has not responded to any subsequent mail from the department. He has not acknowledged paternity; he has not denied paternity; he has not attempted to learn anything about the condition or circumstances of his putative son. Edward K. abandoned the child. Never having seen or communicated with the child or child's caretaker, other than the aforementioned telephone call, no parent-child relationship could possibly exist. Given the total lack of interest shown by putative father during the boy's lifetime, it could only be detrimental to the boy to try to establish such a relationship. Both grounds are found by clear and convincing evidence as to Edward K.
V. DISPOSITION
CT Page 16091
Having determined that adjudicatory grounds for termination of both parents' rights exist, the court must consider whether termination is in the best interest of the child. In doing so the court considers and makes the seven statutory findings as follows.
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate reunion of the child with the parent.
No services were offered to putative father since he remained incommunicative, and refused all attempts by the petitioner to engage him in the process.
Mother was offered on a timely basis counseling services, both individual and couples with her husband. When her husband rejected any further attempts at counseling and reconciliation, mother's own situation deteriorated. She ceased counseling on a regular basis, and was discontinued three separate times from counseling programs for her failure to attend. Mother was offered an assisted living program, which would have addressed substantially almost all of her issues, and facilitated a rapid reunification. Mother rejected the program because she found its regulations too stringent and confining. Mother was offered a lengthy visitation program through Madonna Place, which for a brief period was effective, almost leading to unsupervised visits. Mother put that in jeopardy by threatening to leave with her child if left unsupervised. She also became very erratic in her visits, often tardy or missing visits without notice. Ultimately the visits degenerated to the point where the child would physically attack mother, ask for his foster mother instead, and the program director opined that there was no sign of a bond between mother and child.
2. Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
Reasonable efforts were made by the department as to mother and not possible as to putative father, prior to the court finding they were no longer appropriate.
3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
No orders entered with respect to putative father due to his failure to respond to the process. Mother was given specific steps on February 1, CT Page 16092 2000 ordering her, in part, to visit her child, participate and make progress in counseling, and maintain stable housing. Her failures have been discussed.
4. The feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person, and any person who has exercised physical care, custody or control for at least one year and with whom the child has developed significant emotional ties.
The child does not know putative father. The child has no positive feelings for mother as demonstrated by his behavior at the Madonna Place. He actively resists visiting his mother. He attacks her. He calls for his foster mother, whom he calls "Mommy", and looks to foster mother to fill his parental needs. The director of the visitation center saw no evidence of a bond between mother and son.
5. The age of the child.
Timothy is three years old, born 1999.
6. The efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A); the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B); the maintenance of regular contact or communication with the guardian or other custodian of the child.
Putative father's circumstances are unknown. He made one contact with the department by voice-mail, and has failed or refused to respond to any further attempts by the department to communicate with him. He has never seen or communicated with the child or foster parent.
Mother initially participated in counseling services, and visited with her child. After her husband withdrew from the reunification process, and left mother, her circumstances deteriorated, marked by instability in her housing, employment, counseling, and visitation. She was terminated from three separate counseling programs for attendance failures. She was offered, and rejected, assisted housing which would have advanced the possibility of reunification. She has been in a long term relationship with a man, whom she proposes as a potential joint caretaker for her son, yet she acknowledged that he has not seen his own children, of whom he is a joint custodian, in approximately two years. She was arrested CT Page 16093 three separate times between December, 2000 and November, 2001, and was given a one year suspended sentence. Her visitation was sporadic, and had many tardies, or no-shows. Plans for unsupervised visits were thwarted by her threat to take her son and run. The visitation program reported that the child demonstrated no positive bond with mother, even to the point of attacking mother. Mother disclosed to the department that she used cocaine, and alleged a drug overdose, explaining her behavior was induced environmentally. Mother has had the ability to contact the foster mother directly to inquire about the child, but rarely has exercised this privilege.
7. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
No unreasonable conduct by the department, any service provider, foster parent, or other third party prevented mother or putative father from maintaining a relationship with the child, nor did the economic circumstances of mother. Putative father's economic circumstances are unknown to the court, but he has expressed no interest in the child. He did demonstrate an ability to contact the department.
In considering the evidence through the conclusion of the trial, and the seven statutory factors, the court's guidepost for disposition is the best interest of the child, which must be decided by clear and convincing evidence. Long-term stability is essential to a child's health and development. Mother has had many opportunities to stabilize her own life in order to be able to provide her son with the stability his development will require. Putative father has made no effort to provide for the child. The child's counsel recommends termination and adoption so Timothy will be provided for properly. The court agrees, based upon the clear and convincing evidence previously discussed.
VI. ORDER OF TERMINATION
Wherefore, after due consideration of Timothy's need for a secure, permanent placement, and the totality of the circumstances, and having considered all statutory criteria, and having found by clear and convincing evidence that grounds exist to terminate parental rights, and that it is in the child's best interest to do so, the court orders:
That the parental rights of respondents, mother Lisa D. and putative father Edward K. are hereby terminated as to the child Timothy D. CT Page 16094
That the Commissioner of the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for him.
That a permanency plan shall be submitted to the court within thirty days, and such further reports shall be filed with the court as required by law.
BY THE COURT
___________________ JOHN C. DRISCOLL, JUDGE CT Page 16095